Maria ANDRIANOVA, Appellant–
Defendant,

v.

INDIANA FAMILY AND SOCIAL
SERVICES ADMINISTRATION,
Appellee–Respondent.

No. 29A05–0301–CV–49.

Court of Appeals of Indiana.

Nov. 20, 2003.

Crystal Francis, Indiana Legal Services, Inc., Indianapolis, IN, Lee A. O'Connor, Indiana Legal Services, Inc., Evansville, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

1. 405 IAC 221.

## OPINION

FRIEDLANDER, Judge.

Maria Andrianova appeals a determination by the Indiana Family and Social Services Administration (FSSA) that she is not entitled to full benefits under Indiana's Medicaid for the Aged program.[1]

We affirm.

The undisputed facts are that Andrianova was born in Russia and lived there most of her life. She entered the United States on November 25, 1994, on a visitor's visa and moved into her daughter's home. In the summer of 1995, Andrianova began experiencing symptoms of a serious illness. She had no medical insurance or means to pay for medical treatment in the United States. Therefore, she returned to Russia on February 25, 1995, to obtain medical treatment. In Russia, Andrianova was diagnosed with uterine cancer. She was hospitalized, underwent surgery, and received radiation treatments from November 15 until December 30, 1995. After she was discharged from the hospital, Andrianova applied for another visa in order to return to the United States. She applied multiple times before she ultimately was able to obtain a visa. In the meanwhile, Andrianova underwent chemotherapy in 1996 from April 4 through April 25, July 18 through August 8, and October 30 through November 21. On October 17, 1996, Andrianova was approved for a new visa and she returned to the United States on December 11, 1996. In May, 1998, Andrianova once again experienced symptoms associated with cancer. In July of that year, she returned to Russia for follow-up medical treatment. She returned to the United States on August 15, 1998, and has remained in this country since that time.

On February 22, 2000, Andrianova was granted Lawful Permanent Resident (LPR) status by the Immigration and Naturalization Service (the INS). She filed an application for Medicaid on July 18, 2000, and attained the age of sixty-five one week later, on July 25, 2000. On July 31, 2000, an administrative law judge (ALJ) approved Andrianova for emergency assistance only and denied her request for full Medicaid benefits. She appealed that determination to the FSSA, which affirmed the ALJ's decision. Andrianova appealed the FSSA's decision to the Hamilton Superior Court. The court reversed the FSSA's ruling that "lawful permanent resident status prior to August 22, 1996 is required to exempt an immigrant from the provisions of [Personal Responsibility and Work Opportunity Reconciliation Act of 1996, or] PRWORA[,]". *Appellant's Appendix* at 33, and remanded for further proceedings. On remand, the ALJ received additional evidence and again denied full Medicaid benefits, this time on the basis that Andrianova had not maintained continuous presence in the United States for five years, with the relevant period commencing to run when she initially entered the United States and continuing through the time that she obtained permanent legal resident status. The FSSA affirmed that ruling and Andrianova again sought judicial review. This time, the trial court affirmed the denial of benefits. Andrianova appeals that ruling.[2]

When reviewing the decision of an administrative agency, we are bound by the same standard of review as the trial court. *Huffman v. Indiana Dept. of Envtl. Mgmt.*, 788 N.E.2d 505 (Ind.Ct.App. 2003). We will reverse an administrative decision only if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law; (2) contrary to a constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence." *Id.* at 507; *see* Ind.Code Ann. § 4-21.5-5-14(d) (West 2002). We are free to resolve any legal questions that arise from the agency's decision. We are not bound by its interpretation of the law because the law is the province of the judiciary. *Huffman v. Indiana Dept. of Envtl. Mgmt.*, 788 N.E.2d 505. Nevertheless, we "pay due deference to the interpretation of a statute by the administrative agency that is charged with its enforcement in light of its expertise in its given area." *Metro. Sch. Dist. of Southwest Allen County v. Allen County*, 753 N.E.2d 59, 63 (Ind.Ct.App. 2001).

When reviewing an administrative agency's decision, the trial court may not try the facts de novo or supplant the agency's judgment with its own. *S & S Enters., Inc. v. Marion County Bd. of Zoning Appeals*, 788 N.E.2d 485 (Ind.Ct. App.2003), *trans. denied; see also Metro. Sch. Dist. of Southwest Allen County v. Allen County*, 753 N.E.2d at 62 (review is not "de novo in the sense of a complete retrial of the issues involved. Rather, [the court] must go no further than to examine the propriety of the agency's facts as the agency found them and the propriety of the agency's order in light of the facts found") (quoting *Taylor v. Ind. Family & Soc. Servs.*, 699 N.E.2d 1186, 1189 (Ind.Ct. App.1998)). Neither the trial court nor this court may reweigh the evidence or reassess witness credibility. *Id.* Rather, reviewing courts must accept the facts as

---

2. Oral argument was held before this court in Indianapolis on September 30, 2003. We commend both counsel for the quality of their participation at that proceeding.

found by the agency factfinder. *Id.* The party seeking judicial review bears the burden of demonstrating that the agency's action is invalid. I.C. § 4–21.5–5–14(a); *Metro. Sch. Dist. of Southwest Allen County v. Allen County,* 753 N.E.2d 59.

We begin with a brief overview of the Medicaid program, which was established in 1965 as Title XIX of the Social Security Act, 79 Stat. 343. Its purpose is to provide medical assistance to needy individuals whose income and available resources are insufficient to meet the costs of necessary medical care and services. 42 U.S.C. § 1396; *Sullivan v. Day,* 681 N.E.2d 713 (Ind.1997). It operates through a combined scheme of federal and· state statutory and regulatory authority. *See* 42 U.S.C. § 1396a; Ind.Code Ann. § 12–15–1–1 (West, PREMISE through 2003); *Sanders v. State Family & Soc. Svcs. Admin.,* 696 N.E.2d 69 (Ind.Ct.App.1998). States are free to decide whether to participate in the Medicaid program and receive federal assistance. After having opted in to the cost-sharing program, however, states must thereafter comply with the requirements imposed by the Medicaid Act and by the Secretary of Health and Human Services. *Indiana State Bd. of Pub. Welfare v. Tioga Pines Living Ctr., Inc.,* 637 N.E.2d 1306 (Ind.Ct.App.1994).

We turn our attention now to the specific Medicaid provision in controversy. Andrianova applied for full Medicaid benefits. As a resident alien, her eligibility for such benefits is determined by application of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which is codified at 8 U.S.C. § 1601, *et seq.* PRWORA restricts the eligibility of legal immigrants for, among other things, Medicaid benefits. It contains a provision that imposes the following five-year limitation:

> Notwithstanding any other provision of law and except as provided in subsections (b), (c), and (d) of this section, an alien who is a qualified alien (as defined in section 1641 of this title) and who enters the United States on or after August 22, 1996 is not eligible for any Federal means-tested public benefits for a period of 5 years beginning on the date of the alien's entry into the United States with a status within the meaning of the term "qualified alien."

8 U.S.C. § 1613(a). As the qualifying language of the statute indicates, neither that section nor any other in PRWORA specifically addresses Andrianova's situation, because she entered the United States *before* August 22, 1996. The United States Department of Justice filled that statutory void with regulations entitled "Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996" (the Interim Guidance Regulations). The effective date of those regulations was October 29, 1997. The authority to enact the Interim Guidance Regulations was explained therein as follows:

> Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") requires the Attorney General, by February 1998, to promulgate regulations requiring verification that an applicant for federal public benefits is a qualified alien eligible to receive federal public benefits under the Act. Amendments to the PRWORA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 also require the Attorney General, within the same time period, to establish fair and nondiscriminatory procedures for applicants to provide proof of citizenship. Amendments to the PRWORA by the Balanced Budget Act of 1997 require the Attorney General, by November 3, 1997,

to issue interim verification guidance that sets forth procedures that benefit providers can use to verify citizenship, qualified alien status, and eligibility under Title IV of the PRWORA prior to issuance of the final regulations. In accordance with this last statutory requirement, the Attorney General, in consultation with deferral benefit-granting agencies, has developed this interim guidance.

62 Fed.Reg. 61344 (Nov. 17, 1997).

Reduced to its simplest terms, this lawsuit focuses upon one section of the Interim Guidance Regulations. That section addresses the eligibility of aliens such as Andrianova who entered the United States before August 22, 1996, and obtained qualified legal alien status sometime thereafter. We reproduce here the pertinent regulations:

- If the applicant entered the United States before August 22, 1996, but obtained qualified alien status after that date, *you must verify that the alien was continuously present in the United States from the latest date of entry prior to August 22, 1996, until the date he or she obtained qualified legal alien status. In general, any single absence from the United States of more than 30 days, or a total of aggregated absences of more than 90 days, should be considered to interrupt "continuous presence."* To verify continuous presence, you should follow guidance provided by the agency or department overseeing your program, which may call for an applicant to present additional documentation such as tax returns, bills, rent receipts, or a letter from an employer. If the applicant can demonstrate continuous presence, he or she is eligible for all federal means-tested public benefits for which he or she satisfies all programmatic eligibility requirements.

- If the applicant entered the United States before August 22, 1996, and obtained qualified alien status after that date but was not continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, determine if he or she is eligible under paragraphs 2 and 3 below.

2. With certain exceptions listed below, . . . an applicant who entered the United States before August 22, 1996, and obtained qualified alien status after that date but did not remain continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, is ineligible for all federal means-tested public benefits during the first five years after he or she obtained qualified alien status. Thus, unless the applicant falls within one of the excepted categories listed below, such an applicant is only eligible for federal mean-tested public benefits for which he or she satisfies all programmatic eligibility requirements if five years have passed from the date the applicant attained qualified alien status . . . .

As noted above, the following categories of aliens are exempt from this five-year ban:

a. Refugees, asylees and aliens whose deportation or removal has been withheld . . . ;

b. Qualified aliens lawfully residing in any state who are honorably discharged veterans and who fulfill minimum active-duty requirements, or who are on non-training active duty in the U.S. armed forces . . . ;

c. Cuban–Haitian entrants . . . ;

d. Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing,

and Related Programs Appropriations Act of 1988; and

e. With respect to SSI and Medicaid benefits, American Indians born in Canada and to whom the provisions of section 289 of the INA apply or members of an Indian tribe (as defined in section 4(e) of the Indian Self–Determination and Education Assistance Act).

*Id.* at 61415 (emphasis supplied).

■ The FSSA determined that Andrianova did not meet the criteria set out in the Interim Guidance Regulations because she had not maintained a "continuous presence" in the United States. Therein lies the crux of this lawsuit: what is the meaning of "continuous presence" in this context? We can find no case—whether emanating from Indiana, other states, or federal courts—that addresses the question. Therefore, it appears that we are confronted with a question of first impression. We will begin our analysis with an examination of the parties' respective arguments on that issue.

Andrianova does not dispute that "continuous presence" connotes actual, physical presence. Nor does she dispute that she was not actually, physically present in the United States for the entirety of the five-year span immediately preceding her attainment of LPR status. She contends, however, that such is not fatal to her claim for full Medicaid benefits. According to Andrianova, the five-year requirement set out in PRWORA is subject to exceptions. The existence of exceptions, according to Andrianova, is indicated by the inclusion of the phrase "In general" at the beginning of the sentence announcing the five-year requirement. Andrianova explains her contention as follows:

The plain language of the *Interim Guidance* recognizes the existence of exceptions to the rule providing that "continuous presence" is interrupted by a single

absence in excess of 30 days or aggregated absences of more than 90 days. The use of the term "in general" demonstrates that the Attorney General did not seek to create an absolute rule, but rather a presumptive rule which allows for exceptions.

*Appellant's Brief* at 12.

Where are these exceptions to be found? Andrianova contends that we should consult U.S. immigration law "to identify the factors governing whether to allow an exception to the general 30– and 90–day rule." *Id.* at 13. Andrianova specifically directs our attention to 8 U.S.C. §§ 1613 and 1641, which she contends govern eligibility for Medicaid benefits. Those provisions are part of Title 8 of the United States Code, which contains the Immigration and Nationality Act. Therein, according to Andrianova, we can glean the meaning of "continuous presence" as used in this context.

In immigration law, "continuous presence" has a "long-standing" history of usage that is "not defined by an absolute number of days." *Id.* at 16. Rather, according to Andrianova, the meaning is somewhat more fluid than that. Indeed, it is so much so that, in some cases, "circumstances can be suggested where an absence of even several years would not prevent an alien from being continuously physically present." *Id.* at 17 (quoting *McLeod v. Peterson,* 283 F.2d 180, 186 (3d Cir.1960)). How can "continuous physical presence" contemplate periods of physical absence from the country? Through application of the so-called *Fleuti* doctrine. The *Fleuti* doctrine stems from the decision of a divided United States Supreme Court. *See Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). A brief overview of that doctrine is useful.

In *Fleuti,* the legislation in question was a federal immigration statute that called for deportation of an alien for certain enumerated conditions present at the time of the alien's "entry" into the United States. The Court specifically focused on the meaning of "entry" in 8 U.S.C. § 101(a)(13)[3] of the Immigration and Nationality Act of 1952. The Court noted that § 101(a)(13) came about as a result of court decisions concerning resident aliens returning to the United States following brief trips abroad and then facing deportation proceedings. For the most part, those decisions found in favor of the aliens/petitioners and against deportation. The Court further explained:

> As the House and Senate Committee Reports, the relevant material from which is quoted in the margin, make clear, the major congressional concern in codifying the definition of "entry" was with "the status of an alien who has previously entered the United States and resided therein * * *." This concern was in the direction of ameliorating the harsh results visited upon resident aliens by the rule of *United States ex rel. Volpe v. Smith, supra* [289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298 (1933) ], as indicated by the recognition that "the courts have departed from the rigidity of (the earlier) rule," and the statement that "(t)he bill (gives) due recognition to the judicial precedents."

*Rosenberg v. Fleuti,* 374 U.S. at 457–58, 83 S.Ct. 1804. An important part of the *Fleuti* majority's analysis was its conclusion that Congress sought to ameliorate the harsh results of a strict interpretation of the term "entry" that included literally every crossing of the border into the United States. By so doing, the Court concluded that Congress intended to create exceptions to § 101(a)(13) for "resident aliens who are only briefly absent from the country." *Id.* at 460, 83 S.Ct. 1804. In the end, the Court concluded that one does not actually "depart"—and thus does not "enter" upon returning, from a "trip [that] is innocent, casual, and brief[.]" *Id.* at 461, 83 S.Ct. 1804.

The *Fleuti* doctrine, then, holds that brief, casual, and innocent trips outside of the United States do not constitute departures from the country for purposes of immigration law. In evaluating whether a trip meets the criteria of "brief, casual, and innocent", courts "balance the length of the trip, its purpose, and the presence of travel documents[.]" *Espinoza–Gutierrez v. Smith,* 94 F.3d 1270, 1272 (9th Cir.1996).

Returning now to the instant case, Andrianova contends that the "continuous presence" requirement of the Interim Guidance Regulations should be interpreted so as to incorporate the *Fleuti* doctrine, at least in essence. We say, "in essence" because Andrianova does not necessarily invoke the *Fleuti* doctrine by name, but instead recasts it in a different but similar theoretical approach, i.e., the "emergent reasons" exception. The "emergent rea-

---

**3.** That provision stated, in pertinent part:
The term "entry" means any coming of an alien into the Untied States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: Provided, That [sic] no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

sons" exception is, according to Andrianova, "common in U.S. immigration law." *Appellant's Brief* at 21. We choose not to delve deeply into the history of the exception. For our purposes, it is enough to say that it is an exception that sometimes applies in cases where immigration statutes or regulations impose a prerequisite of "continuous presence" in order to attain or retain eligibility for a particular benefit or status. *See, e.g., Zheng v. Immigration & Naturalization Serv.,* 207 F.Supp.2d 550 (E.D.La.2002) (concerning a statute—8 U.S.C. § 1182(d)(5)(A)—that grants the Attorney General discretionary power to temporarily parole aliens from immigration custody for "emergent reasons"). In cases where the doctrine applies, continuous presence is deemed not to be lacking if the reason for the absence from the United States was of a compelling, unavoidable, emergency nature. We do not disagree with Andrianova's assertion that "emergent reasons" in this context is synonymous with "urgent humanitarian reasons". *Appellant's Brief* at 22. *But see also Matter of C.,* 19 I. & N. Dec. 808, 810 (1988) ("[t]he Immigration and Naturalization Service has adopted the definition found in *Webster's II New Riverside University Dictionary* where the word 'emergent' is defined as 'coming unexpectedly into being' "). In reality, it is the rough equivalent of "brief, casual, and innocent" as established and used in the *Fleuti* doctrine.

Thus, we arrive at the heart of Andrianova's argument. She contends that the Interim Guidance Regulations impose a requirement of continuous presence in the United States for a period of five years, but that, consistent with immigration law in other contexts, such should be understood to envision an exception for "emergent reasons" as defined above. She further contends that her nineteen-month absence from the United States for medical treatment was an "emergent reason" and therefore did not interrupt her continuous presence in the United States for purposes of establishing her eligibility for full Medicaid benefits.

The FSSA's position, on the other hand, is that the Interim Guidance Regulations should be read literally and construed narrowly. According to the FSSA's argument, there are, at most, only six exceptions to the five-year, "continuous presence" requirement. Those exceptions are enumerated in the Interim Guideline Regulations, and five of them are clearly inapplicable in this case. *See Attachment 7—Interim Guidance; Federal Means–Tested Public Benefits* 2(a)-(e) [4], 62 Fed.Reg. at 61414–61416. The sixth exception is, in reality, quasi-definitional in nature. As set forth previously, it provides, "In general, any single absence from the United States of more than 30 days, or a total of aggregated absences of more than 90 days, should be considered to interrupt 'continuous presence.' " *Id.* at 61415. Thus, according to the FSSA, an alien is not "continu-

---

4. Those exception are set out as follows:
   As noted above, the following categories of aliens are exempt from this five-year ban:
   a. Refugees, asylees and aliens whose deportation or removal has been withheld—*see* Attachment 5 to Interim Guidance for definition and documentation;
   b. Qualified aliens lawfully residing in any state who are honorably discharged veterans and who fulfill minimum active-duty service requirements ...;

   c. Cuban/Haitian entrants ...;
   d. Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1998; and
   e. With respect to SSI and Medicaid benefits, American Indians born in Canada and to who the provision of section 289 of the INA apply....
   62 Fed.Reg. at 61415

ously present" during the five-year period if he or she was absent from the United States during that period for more than thirty days at a time or for more than a total of ninety days.

After considering the foregoing arguments and the relevant authority, we conclude that the Interim Guidance Regulations do not admit of the "emergent reason" exception to actual, physical presence, as Andrianova urges. In our view, Congress did not intend for the *Fleuti*, or a *Fleuti*-like, exception to apply. We reach this conclusion for two reasons, which we will explain fully below.

The first reason concerns the question of whether the legislation is to be given an expansive or a restrictive interpretation. The immigration cases cited by Andrianova that were important in the development of the *Fleuti* doctrine arose from legislation that could have been, and indeed was, interpreted as calling for deportation or exclusion [5] of an alien whose arguably disqualifying absence from the United States occurred through no "fault" of the alien. Some of the examples cited by Andrianova were cases that were governed by 8 U.S.C. § 1254(a), which the Supreme Court long ago determined should be construed liberally by application of the *Fleuti* doctrine. *See De Gallardo v. Immigration & Naturalization Serv.*, 624 F.2d 85 (9th Cir.1980) (applying *Fleuti*-like test to reasons for absence in application for suspension of deportation); *Toon–Ming Wong v. Immigration & Naturalization Serv.*, 363 F.2d 234 (9th Cir.1966) and *McLeod v. Peterson*, 283 F.2d 180 (both applying *Fleuti* in evaluating alien's application to suspend deportation). Other cases cited by Andrianova addressed 8 U.S.C. § 1255a, which explicitly creates an exception for "brief, casual, and innocent", *see* 8 U.S.C. § 1255a(a)(3)(B), absences from the United States. *See Catholic Soc. Servs., Inc. v. Meese*, 685 F.Supp. 1149 (E.D.Cal.1988); *Matter of C.*, 19 I. & N. Dec. 808 (1988). It is also noteworthy that in § 1255a, Congress imposed a requirement that, in certain circumstances, aliens must establish that they have "continuously resided" in the United States since the date they were granted temporary resident status. *See* 8 U.S.C. § 1255a(b)(1)(B)(i).[6] The remaining case cited by Andrianova addresses the statute, i.e., 8 U.S.C. § 1182, et seq., governing claims for asylum. *See Marczak v. Greene*, 971 F.2d 510 (10th Cir.1992). That statute explicitly provides an exception for "emergent reasons". *See* 8 U.S.C. § 1182(d)(5)(A). It seems to us that to cite the aforementioned cases in support of reading a *Fleuti*-like requirement into the Interim Guidance Regulations is to beg the question. Those cases either construe statutes that actually contain a *Fleuti* exception, or, in the case of § 1254a, a statute that initially gave rise to the *Fleuti* doctrine. In the latter case, the statute involved was one that Congress clearly intended to be construed liberally. The foregoing cases perhaps shed light on *how*

---

5. The term "exclude" pertains to aliens that were never admitted to the United States. Historically, "deport" referred to the expulsion of aliens who have effected actual entry and admission into the United States. In modern usage, "deport" has been more or less supplanted by the term "remove." *See Zheng v. Immigration & Naturalization Serv.*, 207 F.Supp.2d 550 (E.D.La.2002).

6. We note that in this statute, Congress explicitly delegated to the Attorney General the task of prescribing regulations establishing a definition of the phrase "resided continuously" in this context. *See* 8 U.S.C. § 1255a(g)(1)(A). Congress further directed that, in so doing, the Attorney General "shall take into account absences due merely to brief and casual trips abroad." 8 U.S.C. § 1255a(g)(2)(A).

the *Fleuti* doctrine should be applied on a case-by-case basis, but they do little to buttress the argument that it should be read into the regulations in the first place.

We cannot lose sight of the fact that we are endeavoring here to effectuate congressional intent. Congress manifested that intent in the first provision of PRWORA, stating:

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits to this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

8 U.S.C. § 1601. In the preceding provision, Congress clearly expressed its intent that PRWORA be construed narrowly so as to encourage self-reliance among aliens. That guiding principle is one of broad application. Thus, it is of little consequence that, on the facts of Andrianova's case, a strong argument cannot be made that she moved to the United States for the purpose of attaining public benefits. *Cf. City of Chicago v. Shalala,* 189 F.3d 598, 606 (7th Cir.1999) ("[w]hatever the merits of this criticism of the Welfare Reform Act, as a matter of public policy, we cannot say that the statute is rendered irrational simply because *some* aliens who are unable to work will not be induced to provide for themselves"), *cert. denied,* 529 U.S. 1036, 120 S.Ct. 1530, 146 L.Ed.2d 345 (emphasis in original). We must bear in mind that the narrow question before us is whether the "continuous presence" requirement envisions exceptions along the lines of the *Fleuti* doctrine. We need not consider the particular facts of Andrianova's case if that question is answered in the negative.

In summary, we conclude that the Congress clearly expressed its intent that

PRWORA provisions be construed narrowly, so as to restrict aliens' access to public benefits. This is reflected in, among other things, the very title of the legislation we are called upon to construe, i.e., the Federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996. We note also that our research has not uncovered a single case in any state that creates the exception advocated here by Andrianova. Indeed, we can find *no* exception to the five-year requirement of actual, physical, continuous presence, as that phrase is defined in the Interim Guidance Regulations.

The second factor that leads us to conclude that Congress did not intend for the *Fleuti* exception to apply in this statutory scheme is the fact that Congress has demonstrated that it can inject the *Fleuti* doctrine into legislation when it wishes it to be there. As noted above, Congress did not include "brief, casual, and innocent" or "emergent reason" exceptions in the legislation that gave rise to those exceptions, i.e., the Immigration and Nationality Act of 1952. Soon after that legislation was enacted, however, courts began to entertain lawsuits premised on the argument that a literal reading of the requirement of continuance physical presence for the prescribed period of time was unnecessarily harsh and achieved results that were contrary to Congress's intent. The Supreme Court ultimately agreed with that view and, through *Fleuti*, engrafted it into the statute. Subsequent developments demonstrated that the Supreme Court "got it right" in *Fleuti* with respect to Congress's intent.

In the years that followed, Congress's acquiescence in the *Fleuti* doctrine was reflected first in its disinclination to modify the Act in such a way as to repudiate the *Fleuti* Court's interpretation of its intent on that question. Secondly, and more importantly, Congress subsequently began to incorporate *Fleuti*-like exceptions in other areas of immigration legislation. This clearly reflects that Congress is fully capable of expressing its intent to embrace the *Fleuti* doctrine in immigration and public-benefits legislation and will do so when so inclined. *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (if "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). This principle is well illustrated in the Immigration and Naturalization Act.

8 U.S.C. § 1254a(1) of the Act provided that the Attorney General could suspend deportation of an alien who had "been physically present in the United States for a continuous period of not less than seven years[.]" Subsequent court of appeals decisions created an exception in cases where the absence was not meaningfully interruptive. *See, e.g., Phinpathya v. INS,* 673 F.2d 1013 (9th Cir.1981), *rev'd,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984). The Supreme Court reversed that line of cases upon its determination that such an interpretation departed from the Act's plain meaning. *INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401. In response to *Phinpathya,*[7] Congress

---

**7.** The legislative history of that amendment notes:

> The Committee Amendment relaxes the recent Supreme Court interpretation with respect to the seven years "continuous physical" residence requirement to qualify for

suspension of deportation under section 244 of the Immigration and Nationality Act (*INS v. Phinpathya* [464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984)) ]. That decision held that any departure from the U.S. during the seven year period was interrup-

amended the Act to provide exceptions for absences that were "brief, casual, and innocent" and did not "meaningfully interrupt" an alien's continuous presence. *See* 8 U.S.C. § 1254(b)(2). Finally, in 1996, Congress enacted a new definition of "continuous physical presence" in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat 3009–546 (1996) (the IIRIRA). The IIRIRA deleted the "brief, casual, and innocent" exception and replaced it with the following:

> *Treatment of certain breaks in presence.* An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

8 U.S.C. § 1229b(d)(2). Although the "brief, casual, and innocent" exception was thereby deleted from § 1254b, it remained in place in § 1254a(c)(4) (temporary protected status) and § 1255a(3)(B) (adjustment of status for pre–1982 entrants). We have already indicated that the "brief, casual, and innocent" exception found in § 1255a(3)(B) is a direct descendant of the *Fleuti* decision.

■ The foregoing review convinces us that the presence or absence of a *Fleuti*-like exception in immigration and immigration-related statutes cannot be regarded as the product of congressional inadvertence or oversight. The issue began percolating more than fifty years ago and, in the intervening half-century, Congress has repeatedly demonstrated its awareness of the implications of legislation imposing what has come to be called the *Fleuti* doctrine. State and federal courts at every level have thoroughly explored the parameters of the doctrine as it has evolved on a case-by-case basis in different, but related, statutory schemes. As the courts have endeavored to define the parameters, Congress has shown no hesitance to react legislatively to those court decisions. When language is used in one section of a statute but omitted from others, courts indulge a general presumption that Congress acted intentionally and purposely in so doing. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). That presumption is particularly apt here. Over the years, Congress has seen fit to write the *Fleuti* doctrine into certain areas of immigration law, while omitting it from certain other areas of immigration law. Congress has modified statutes from time to time so as to add the *Fleuti* exception, and it has also modified by deleting the exception.

We agree with Andrianova's assertion that this question must be resolved by consulting not only Medicaid legislation, but also immigration law. Congress's authority in the area of immigration law is "exceptionally broad: 'over no conceivable subject is the legislative power of Congress more complete.'" *Marczak v. Greene*, 971 F.2d at 513 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977)). In turn, this power is entrusted to the Attorney General, whose decisions in this area are accorded a high degree of deference. *Marczak v. Greene*, 971 F.2d 510. Of course, the Attorney General is also authorized to act at the

---

tive of the residence requirement, thus making the alien ineligible for relief. This amendment relaxes the residence requirement in the case of a "brief, casual, and innocent" departure from the U.S.

H.R.Rep. No. 682(1), 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin. News 5649, 5682.

behest of Congress in promulgating rules and regulations. That is precisely what happened here.

Congress directed the Attorney General to promulgate regulations to implement PRWORA. The Attorney General did so, and the result was the Interim Guidance Regulations. In those guidelines, the Attorney General, and by association Congress, enacted the five-year, "continuous physical presence" requirement. No provision was made for a *Fleuti* exception, and the above discussion demonstrates that both the Attorney General and Congress unquestionably are well aware of the doctrine and the fact of its application in related areas of immigration law. Yet, the Attorney General chose not to insert it, and Congress neither stipulated beforehand that it be included in the Attorney General's regulations nor added such a requirement in the years following the passage of PRWORA and the adoption of the Interim Guidance Regulations.

In view of the foregoing, we cannot conclude that Congress's initial and continuing failure to mandate the inclusion of a *Fleuti*-like exception in the relevant provisions of PRWORA was or is anything other than a clear expression of its intent that the five-year "physical presence" requirement, as defined by the Interim Guidance Regulations, is not subject to such an exception. The FSSA interpreted the Interim Guidance Regulations to mean exactly what the ordinary meaning of the language employed in the provision seems to convey, viz., that a person must actually be physically present in the United Stated for the requisite five years, or be ineligible for full Medicaid benefits. The only arguably relevant exception contemplated is that which was explicitly described: a single absence of no more than thirty days or a total of aggregated absences of no more than ninety days.

■ Having decided the relevant legal issues, it remains only for us to apply those principles to the facts of Andrianova's case. The relevant facts are that Andrianova entered the United States on November 25, 1994. On February 22, 2000, she attained LPR status, which conferred upon her qualified legal alien status. For our purposes, the dates of entry and attainment of qualified legal alien (i.e., LPR) status are significant in that they define the rules that govern Andrianova's application for benefits. In this case, the applicable rules, which are found in the Interim Guidance Regulations, provide that Andrianova is not currently eligible unless she was "continuously present" in the United States from February 22, 1995 through February 22, 2000. According to the Interim Guidance Regulations, the "continuously present" requirement is to be understood literally—with one exception. She could be eligible even if she had been absent from the United States during the five-year period, so long as no single absence was more than thirty days, or the total of multiple absences did not add up to more than ninety days. Andrianova was absent from the country from February 25, 1995 to December 11, 1996—a period well in excess of both the thirty- and ninety-day limits. Therefore, the FSSA's determination that she was ineligible for full Medicaid benefits was not unreasonable.

The text of 8 U.S.C. § 1613(a), the text of the Interim Guidance Regulations, and the legislative history of those and related provisions do not lead inevitably to a single conclusion with respect to the question before us. Both parties advanced plausible arguments on that question. Yet, the FSSA assured this court at oral argument that it has and continues to interpret the relevant Medicaid guidelines and regulations in a manner consistent with the arguments it has made before this court. We

are aware of the fact that the FSSA is the agency charged with interpreting the statute and regulation in the first instance. Therefore, its interpretation is entitled to some deference unless it is erroneous. *Sullivan v. Day*, 661 N.E.2d 848 (Ind.Ct. App.1996), *adopted by reference in this respect, rev'd on other grounds*, 681 N.E.2d 713 (Ind.1997). Although Andrianova has offered a plausible reading of the statute and regulations, it is not, in our view, the best interpretation of those provisions. In any event, Andrianova has not demonstrated to this court that the FSSA's differing reading and interpretation is contrary to the language of the materials at issue. Accordingly, there is no basis for determining that the FSSA's denial of full Medicaid benefits to Andrianova and others similarly situated is erroneous under the current statutory and regulatory scheme. *See id.* We conclude that FSSA's decision to deny Andrianova's application for full Medicaid benefits was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See Huffman v. Indiana Dept. of Envtl. Mgmt.*, 788 N.E.2d 505. Therefore, Andrianova has failed to carry her burden of demonstrating that action is invalid. I.C. § 4-21.5-5-14(a); *Metro. Sch. Dist. of Southwest Allen County v. Allen County*, 753 N.E.2d 59.

Judgment affirmed.

ROBB, J., and NAJAM, J., concur.