Mark P'POOL, Appellant–Petitioner,

v.

**INDIANA HORSE RACING COMMISSION, Appellee–Respondent.**

No. 45A04–0812–CV–757.

Court of Appeals of Indiana.

Aug. 27, 2009.

Publication Ordered Oct. 6, 2009.

Michael J. Jasaitis, Timothy R. Kuiper, Austgen Kuiper & Associates, Crown Point, IN, Attorneys for Appellant.

Robin L. Babbitt, Karl L. Mulvaney, Kelly R. Eskew, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Mark P'Pool appeals the trial court's order affirming the decision of the Indiana Horse Racing Commission ("IHRC"), which imposed a six-year suspension and $30,000 fine upon P'Pool for violations of IHRC rules. For our review, P'Pool purports to raise a single issue, whether he was denied due process during the IHRC proceedings, based on nine alleged errors delineated below. Concluding the IHRC's decision is supported by substantial evidence, the penalty imposed is not excessive or arbitrary, P'Pool was not denied due process, and the ALJ did not improperly exclude evidence, we affirm.

*Facts and Procedural History*

P'Pool is a licensed owner/trainer/driver with the IHRC. Several horses trained by P'Pool competed in the Spring 2006 standardbred horse racing meet at Hoosier Park. During the Spring 2006 meet, the IHRC began testing horses for the presence of the drug Dexamethasone ("Dex"). Dex is a prescription corticosteroid, which is used as an anti inflammatory. However, studies have indicated that the use of Dex just prior to racing may have a calming or euphoric effect on a horse and may impact the horse's performance. The Association of Racing Commissioners International ("ARCI") classifies Dex as a Class 4 drug. *See* Uniform Classification Guidelines for Foreign Substances, http://www.arci.com/druglisting.pdf. IHRC rules do not prohibit the use of Class 4 medications, including Dex; however, Dex may not be administered to a horse within twenty-four hours of a race. *See* 71 Ind. Admin. Code 8–1–1(b). Dex is a fast-acting medication, which generally clears a horse's system after twenty-four hours. A drug test showing a level of Dex greater than two to three nanograms per milliliter in urine or 0.2 nanograms per milliliter in blood indicates Dex was administered to the horse within the previous twenty-four hours.

The following horses trained by P'Pool tested positive for the presence of Dex after completing their races with the following urine and blood levels:

| Date | Horse | Urine Level (ng/ml) | Blood Level (ng/ml) |
|---|---|---|---|
| 4/19/06 | Pathway's Strength | 26 | 0.5 [1] |
| 4/19/06 | Band of Brothers | 17 | 0.9 [2] |
| 4/21/06 | Just An Icon N | 6.6 | 1.9 [3] |
| 4/26/06 | Victory Lane | 8 | 0.8 [4] |
| 5/18/06 | Pocket John | 16 | 2.1 |
| 5/27/06 | Just An Icon N | 30 [5] | N/A |
| 6/1/06 | Spiritual Warfare | 14 | 1.9 |
| 6/8/06 | Simple As ABC | 50 | 2.6 |
| 6/9/06 | Bluebird Wanda | 9.7 | 1.1 |
| 6/10/06 | Sand Flying Dragon | 13.7 | 2.8 |
| 6/18/06 | Ruby's Z Tam | 11 | 1.1 |

The level of Dex in each test indicated it had been administered within twenty-four hours of the respective horse's race. In addition to testing positive for Dex, Pathway's Strength tested positive for Methylprednisolone, a Class 4 corticosteroid, and Clenbuteral, a Class 3 bronchodilator. Sand Flying Dragon also tested positive for Methylprednisolone, and Bluebird Wanda tested positive for EPO, a Class 2 synthetic hormone that stimulates red blood cell production.

On June 11, 2006, having receiving the first five positive tests, IHRC executive director Joe Gorajec interviewed P'Pool. Gorajec did not mention the positive Dex tests because he wanted to investigate the full extent of Dex use among all horsemen and did not want to tip off others to the Dex testing. Gorajec specifically asked whether P'Pool had "administered any drugs of any kind to any of the horses that have participated in the 2006 Hoosier Park meet." App. of Appellee at 221. Gorajec also asked what "non-injectables" P'Pool

1. A secondary blood level test conducted by the Pennsylvania Equine Toxicity Research Lab indicated a Dex blood level of 0.634 ng/ml.

2. A secondary blood level test indicated a Dex blood level of 1.217 ng/ml.

3. A secondary blood level test indicated a Dex blood level of 2.177 ng/ml.

4. A secondary blood level test indicated a Dex blood level of 1.367 ng/ml.

5. No documentary evidence exists for this urine level. However, the director of the testing laboratory calculated the approximate level using the testing data packet during direct examination. *See* Appendix of Appellee at 958.

had administered to his horses and whether P'Pool had used "anything ... that would be a drug." *Id.* at 221–22. P'Pool mentioned that he had given horses bute paste[6] and oral antibiotics, but he did not mention administering Dex, Methlyprednisolone, or EPO. At the conclusion of the interview, Gorajec handed P'Pool a letter requesting that P'Pool send him "medication records for all horses that you currently train (or have trained in 2006) that have competed at the 2006 Spring Hoosier Park standardbred horse racing meet," including all veterinary and non-veterinary treatments. *Id.* at 320. In response, P'Pool submitted several pages of veterinary records and an email describing his use of bute paste or pills, oral antibiotics, and a feed supplement. None of the veterinary records mention the use of Dex, Methylprednisolone, or EPO.

On June 23, 2006, having received two additional positive tests Gorajec conducted a second interview with P'Pool. Gorajec informed P'Pool that one of his horses had tested positive for Dex and asked P'Pool if he could explain the result. P'Pool responded that he mixed Dex or Azium[7] with DMSO[8] to make a "leg paint," which he applied to his horses' knees, hocks, and ankles. *Id.* at 264. P'Pool explained that he often wraps the area with cotton and saran wrap in order to "sweat" the medication into the legs. *Id.* P'Pool stated that he buys the leg paint pre-made from veterinarians by the pint or the gallon; however, he could not specifically name any veterinarians who had sold him the leg paint or recall how often he purchased leg paint. At the conclusion of the second interview, Gorajec advised P'Pool of his right to request split sample testing to confirm the positive tests. P'Pool requested split sample testing for Band of Brothers. A lab at Louisiana State University conducted the test and found Dex in the urine sample at a level of 60.1 ng/ml.

On July 7, 2006, Gorajec conducted a third interview. Gorajec asked P'Pool to provide a detailed explanation of his leg paint application and preparation process. P'Pool described two recipes for combining Dex and DMSO to create the leg paint. At the conclusion of the third interview, Gorajec gave P'Pool written notice of a disciplinary hearing before the IHRC's racing judges on July 13, 2006, for charges of administering Dex to Pocket John, Just An Icon N (second positive test), and Spiritual Warfare[9] and making false statements to the IHRC.

Using the information supplied by P'Pool and two other trainers under investigation, the IHRC commissioned a scientific study (the "Purdue Study") designed by the IHRC chief veterinarian and conducted at Purdue University's School of Veterinary Medicine to determine whether administering Dex combined with DMSO in leg paint would result in detectable levels of Dex in blood and urine samples. The Purdue study used several concentrations of Dex, including one with double the amount of Dex than P'Pool indicated was

---

6. Bute paste refers to phynylbutazone, a Class 4 non-steroidal anti-inflammatory medication.

7. Azium is a powdered form of Dex.

8. DMSO stands for Dimethylsulfoxide, a Class 5 drug used to treat inflammation. It purportedly has the property of quickly penetrating the horse's skin and aiding the transport of other drugs through the skin.

9. 71 IAC 10–2–1(f), which governs proceedings by racing judges, requires any suspension of license or civil fine to be given within sixty days of the date of the violation. As a result, the racing judges did not have jurisdiction to punish P'Pool for the positive tests for Pathway's Strength, Band of Brothers, Just An Icon N (first positive test), or Victory Lane.

contained in his leg paints. Blood and urine samples were taken from the horses at eight, twenty-four, and thirty-two hour intervals; all samples tested negative for the presence of Dex.

On July 19, 2006, a panel of three IHRC judges held a hearing at which P'Pool appeared with counsel. Prior to the hearing, P'Pool agreed to allow the judges to hear evidence regarding an additional three positive tests for Simple As ABC, Bluebird Wanda, and Sand Flying Dragon. The racing judges heard testimony from P'Pool and Gorajec and reviewed the drug tests. On July 22, 2006, the racing judges issued two rulings: #26078 finding P'Pool gave false and misleading information to the IHRC and imposing a sixty-day suspension and a $1000 fine; and #26079 finding P'Pool administered Dex to Pocket John, Just An Icon N, Spritual Warfare, Simple As ABC, Bluebird Wanda, and Sand Flying Dragon within twenty-four hours of a race and imposing a second sixty-day suspension and $1000 fine. The racing judges also ordered all of the horses disqualified and their winnings forfeited and redistributed. Finally, the racing judges referred the charges to the IHRC for further disciplinary action. On July 31, 2006, P'Pool filed an appeal of the racing judges' decision. An administrative law judge ("ALJ") denied the appeal after a hearing.

In his role as executive director, Gorajec considered the referred charges from the racing judges as well as the other positive tests and prepared preliminary report #26004 pursuant to 71 IAC 10–3–20(b). Gorajec found that P'Pool was responsible for the eleven positive Dex tests and had made false and misleading statements to the IHRC. As a result, Gorajec recommended a suspension of six years and a $30,000 fine. P'Pool requested a hearing before an ALJ to contest the preliminary report.

The ALJ initially scheduled a hearing on November 10, 2006. The ALJ ordered that preliminary discovery, including witness lists, be completed by September 26, 2006, and final discovery be completed by October 20, 2006. P'Pool tendered his preliminary witness list on October 2, 2006, which listed four veterinarians as possible witnesses. In response to the IHRC's expert witness interrogatories, P'Pool indicated he intended to call the veterinarians as expert witnesses and provided summaries of their anticipated testimony. The IHRC made three attempts to set deposition dates for the veterinarians with P'Pool without success. In December 2006, the IHRC contacted the four veterinarians directly. Two of the veterinarians, Dr. Tobin and Dr. Hollendonner, were not aware that they were expected to testify as witnesses for P'Pool. On January 2, 2007, the IHRC made a fourth request for deposition dates and indicated it would move to exclude the veterinarians as witnesses if it did not receive a response by January 9, 2007. On January 9, 2007, at 5:52 p.m., P'Pool's counsel faxed a letter to counsel for the IHRC indicating he would have deposition dates for all expert witnesses by January 12, 2007. On January 10, 2007, the IHRC moved to exclude the four veterinarians as expert witnesses because P'Pool had failed to cooperate in discovery, and the ALJ granted the motion. On January 12, 2007, P'Pool provided a list of dates when his counsel was available for depositions, but the letter made no mention of the availability of the veterinarians.

The ALJ held a hearing on March 30, 2007, at which it heard testimony from: Dr. Norman Hester, the director of the laboratory that conducted the drug testing; Dr. Ursula Jedra, the IHRC Veterinarian; Dr. Lawrence Soma, an expert in horse racing toxicology; Gorajec; and P'Pool. On May 7, 2007, the ALJ issued

detailed findings of fact and conclusions of law recommending the IHRC adopt the sanctions proposed in Gorajec's preliminary report. P'Pool filed a written objection to the ALJ's order, but did not file a brief in support or request oral argument before the IHRC. On June 26, 2007, the IHRC issued its final order imposing the sanctions proposed by Gorajec's preliminary report.

P'Pool filed a petition for judicial review of the IHRC's final order. On October 2, 2008, the trial court issued findings of fact and conclusions of law affirming the IHRC's final order. P'Pool then filed a motion to correct error, which the trial court denied on November 10, 2008. P'Pool now appeals.

*Discussion and Decision*

### I. Standard of Review

■ The Administrative Orders and Procedures Act provides the standard for judicial review of an administrative decision. We will reverse an administrative decision only if it is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind.Code § 4–21.5–5–14(d); *Indianapolis Downs, LLC v. Ind. Horse Racing Comm'n,* 827 N.E.2d 162, 170 (Ind.Ct.App. 2005). An administrative decision is arbitrary and capricious only when it is willful and unreasonable, without consideration or in disregard of the facts and circumstances of the case, or without some basis which could lead a reasonable person to the same conclusion. *Indianapolis Downs,* 827 N.E.2d at 170.

■ The party challenging an agency decision bears the burden of demonstrating its invalidity. Ind.Code § 4–21.5–5–14(a). When reviewing an administrative agency's decision, "[n]either the trial court nor this court may reweigh the evidence or reassess witness credibility." *Andrianova v. Ind. Family Soc. Servs. Admin.,* 799 N.E.2d 5, 7 (Ind.Ct.App.2003). Rather, we must accept the facts as found by the agency factfinder. *Id.* In addition, in light of an administrative agency's expertise in its given area, we give deference to the agency's interpretation of the statutes and rules it is charged with enforcing. *Id.*

### II. Errors Alleged by P'Pool

P'Pool's argument section is divided into nine sections. We address the error alleged in each section in turn below.

#### A. Withholding of Positive Tests

■ P'Pool first alleges the IHRC violated his due process rights by failing to disclose his positive Dex tests until it had accumulated several alleged violations against him. P'Pool provides no authority to support his contention that the delay in notifying him of positive tests violated his due process rights and was "in direct contravention to the purposes of the IHRC rules." Brief of Appellant at 17. Indiana Appellate Rule 46(A)(8)(a) requires that all arguments be supported by "citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal." A party who fails to comply with Appellate Rule 46(A)(8)(a) waives the argument on appeal. *See Weida v. City of West Lafayette,* 896 N.E.2d 1218, 1227 (Ind.Ct.App. 2008). Despite the fact that P'Pool has waived this argument, the argument has no merit.

■ The notice requirement for a disciplinary proceeding before the judges requires that notice be provided at least

twelve hours before a hearing. 71 IAC 10–2–4(a). The rule makes no mention of a deadline to provide notice following a suspected violation. Similarly, the notice requirement for a disciplinary proceeding before the IHRC requires only notice at least five days before a hearing. 71 IAC 10–3–5(a). Again, the rule makes no mention of a deadline to provide notice following a suspected violation.

Gorajec testified before the ALJ that although the racing judges are limited to taking disciplinary action within sixty days of a violation, the IHRC has no similar time limit. Gorajec also explained the delay in providing notice of the positive Dex tests to P'Pool. The IHRC was engaged in a broad investigation of the misuse of Dex by horsemen. Gorajec explained that he did not want to tip off others to the IHRC's Dex testing before he had an opportunity to discover the full extent of its use. Indeed, the investigation resulted in disciplinary proceedings against several other trainers for positive Dex tests. The IHRC had no duty to immediately inform P'Pool of the positive tests, and its decision to withhold notice while it continued testing was not arbitrary or capricious. As a result, P'Pool's first argument fails.

### B. Excessiveness of the Penalty

■ Second, P'Pool argues that his penalty is excessive, arbitrary and capricious. The racing judges imposed the maximum penalty allowed them by IHRC rules against P'Pool and referred his charges to the IHRC for consideration of further penalties. 71 IAC 10–3–1(b) allows the IHRC to "initiate a disciplinary action … for the purpose of modifying or assessing penalties or sanctions, or both, *in addition to* any penalties or sanctions assessed by the judges." (Emphasis added.) A ruling by the racing judges imposing sanctions does not prevent the IHRC from imposing a more severe penalty. 71 IAC 3–2–3(j). However, in assessing penalties, the IHRC is required to "consider the severity of the violation and may consider the licensee's record, including the number and recency of past rulings … with special notice taken of the same or related offenses." 71 IAC 2–11–1. The amount of the penalty may not exceed $5,000 per violation. 71 IAC 10–3–20(b). IHRC rules do not limit the possible suspension that may be imposed. In fact, the IHRC may choose to revoke a license entirely. 71 IAC 5–1–14(a).

The IHRC found P'Pool responsible for eleven positive Dex tests within two months. As such, the maximum fine it could have imposed was $55,000. In addition, the IHRC found that P'Pool made false and misleading statements to the IHRC during his interviews by failing to disclose the administration of Dex and the other drugs. The IHRC presented evidence to the ALJ of sanctions imposed for similar violations of the race day medication rule which are consistent with P'Pool's sanction on a per incident basis.[10] Therefore, the sanctions are within the IHRC's administrative power, and they are not arbitrary or capricious.

### C. Time Limitation on Disciplinary Action

■ Third, P'Pool argues the IHRC improperly considered violations that were

---

**10.** Two veterinarians, each of whom injected a horse with vitamins on race day, were suspended for one year and six months respectively and each was fined $5,000. Three other horseman caught in the IHRC's investigation of Dex use, who subsequently admitted their violations in settlement agreements, each received a one-year suspension and $5,000 fine for a maximum of three violations. By comparison, P'Pool received a fine of roughly $2,700 and a suspension of roughly six and one-half months per violation.

time barred before the racing judges in imposing the sanctions against him. 71 IAC 10–2–7(f) requires racing judges to impose penalties within sixty days of a violation. As such, disciplinary proceedings before the racing judges have an implied time bar to bringing disciplinary action. At the time of the hearing before the racing judges, the violations regarding Pathway's Strength, Band of Brothers, and Just An Icon N (first positive test) were older than sixty days. As such, the racing judges did not have jurisdiction to impose discipline for those violations.

However, 71 IAC 10–3–1(b) gives the IHRC independent investigative and disciplinary power in addition to that exercised by the racing judges. No rule or statute imposes a time bar to disciplinary actions brought by the IHRC. Therefore, the IHRC had the power to independently investigate and sanction P'Pool for all eleven of the positive Dex tests, and P'Pool's argument has no merit.

### D. Qualifications of IHRC's Official Veterinarian

■ Fourth, P'Pool argues that Dr. Jedra, the IHRC's official veterinarian, who oversaw the collection of blood and urine samples, was not licensed in Indiana as required by 71 IAC 3–12–1. P'Pool failed to raise this issue before the ALJ even though Dr. Jedra testified at the hearing and P'Pool extensively cross-examined her. Generally, issues that were not raised before the ALJ are waived for judicial review. Ind.Code § 4–21.5–5–10. P'Pool has not demonstrated that the status of Dr. Jedra's license could not have been discovered by due diligence until after the hearing—the Indiana Professional Licensing Agency will verify the status of a license by phone or through a free online verification search. Therefore, P'Pool has waived judicial review of this issue. In addition, P'Pool makes no argument demonstrating

how the status of Dr. Jedra's license could have affected the test results. Therefore, this argument also fails.

### E. Exclusion of P'Pool's Expert Witnesses

■ Fifth, P'Pool argues the ALJ improperly prevented him from presenting the testimony of expert witnesses to rebut the positive Dex tests. 71 IAC 10–3–9(b) states that discovery in the ALJ hearing is subject to "the civil procedure statutes of [Indiana]." Indiana Trial Rule 37(B)(2)(b) allows the ALJ to prohibit a party who refuses to cooperate with discovery from introducing designated matters into evidence. *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 941, 951 (Ind.Ct.App.2005) ("Where remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate."). The decision to impose sanctions for discovery violations is within the ALJ's discretion. *Drew v. Quantum Systems, Inc.*, 661 N.E.2d 594, 595 (Ind.Ct. App.1996). The law does not require the imposition of lesser sanctions prior to excluding a witness, only that the sanction be just. *See id.*

Although P'Pool listed four veterinarians as expert witnesses, he ignored, without explanation, multiple requests by the IHRC to provide the veterinarians for deposition. In addition, when the IHRC contacted the veterinarians, two of them did not know they were expected to testify, and one of them had never heard of P'Pool. However, P'Pool had listed all four veterinarians in his responses to the IHRC's expert witness interrogatories, including summaries of their expected testimony. Therefore, even though the ALJ's decision to exclude the expert witnesses is extreme, we cannot say that it was an abuse of discretion in light of P'Pool's abuse of the discovery process.

### F. The Purdue Study

■ Sixth, P'Pool argues the Purdue study was flawed because it did not approximate the conditions under which he applied leg paint containing Dex to his horses. P'Pool cross-examined Dr. Jedra at length regarding the Purdue study, including questions about the applicability of the study to his situation. His arguments on appeal amount to a request for this court to reweigh the evidence, which our standard of review prohibits us from doing. *Andrianova*, 799 N.E.2d at 5. Therefore, we decline to address the merits of this argument.

### G. Denial of Discovery Requests

■ Seventh, P'Pool argues the ALJ improperly denied his discovery requests. In order to preserve an objection to an ALJ's order, a party must identify the objection in writing with reasonable particularity. Ind.Code § 4–21.5–3–29(d)(1); 71 IAC 10–3–15(b)(3)(A). P'Pool did not object to the ALJ's denial of his motion to compel discovery in his written objection to the ALJ's order. Therefore, he has not preserved this issue for judicial review.

### H. Evidence Supporting the IHRC's Order

■ Eighth, P'Pool argues that the IHRC's finding that he made false and misleading statements is not supported by substantial evidence. Gorajec asked P'Pool directly whether he had administered any drugs to his horses, including non-injectibles and "anything that would be a drug," App. of Appellee at 221–22; P'Pool replied that he had not. After being informed of positive tests for Dex, P'Pool indicated that he only used Dex in leg paint and not within twenty-four hours of a race. The ALJ heard evidence of the results of the Purdue study showing that P'Pool's explanation for the presence of Dex due to the use of leg paint was not plausible. In addition, the levels of Dex in the blood and urine samples are well above the levels expected twenty-four hours after administration of the drug. Therefore, a reasonable person could infer from the evidence that P'Pool made false and misleading statements to Gorajec during his interviews. As a result, the evidence is sufficient to support the IHRC's finding.

### I. Other Due Process Errors

Finally, P'Pool argues the trial court erred when it found he failed to preserve any due process issues for review. P'Pool fails to provide cogent argument or citations to authority in support of his contention. Therefore, he has waived review of this argument. App. R. 46(A)(8)(a). In addition, this opinion has addressed all of the due process errors raised in P'Pool's written objection to the IHRC's order, as well as several that were not properly raised. Therefore, P'Pool's final argument fails.

### Conclusion

The IHRC's decision is supported by substantial evidence and the penalty imposed is not excessive or arbitrary. In addition, P'Pool was not denied due process and the ALJ did not improperly exclude evidence. As a result, we affirm the final order of the IHRC.

Affirmed.

DARDEN, J., and MATHIAS, J., concur.

### ORDER

Appellee, Indiana Horse Racing Commission, by counsel, has filed a Motion to Publish the Memorandum Decision in this appeal.

Having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. Appellee's Motion to Publish is GRANTED. This Court's opinion handed down in this cause on August 27, 2009, marked Memorandum Decision, Not for Publication, is now ORDERED PUBLISHED.

DARDEN, ROBB, MATHIAS, JJ., concur.