827 N.E.2d 162 (2005)
INDIANAPOLIS DOWNS, LLC d/b/a Indiana Downs, Appellant-Retitioner,
v.
INDIANA HORSE RACING COMMISSION and Hoosier Park, L.P., Appellees-Respondents.
No. 73A01-0412-CV-515.
Court of Appeals of Indiana.
May 13, 2005.
*163 J.D. Lux, Lux & Lux, P.A., Peter G. DePrez, Brown, DePrez and Johnson, Shelbyville, IN, Attorneys for Appellant.
Karl L. Mulvaney, Robin L. Babbitt, Kelly R. Eskew, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellee Indiana Horse Racing Commission.
William P. Diener, Edward P. Steegmann, Ice Miller, Indianapolis, IN, Attorneys for Appellee Hoosier Park L.P.

OPINION
VAIDIK, Judge.

Case Summary
Indianapolis Downs, LLC, d/b/a Indiana Downs, appeals the trial court's dismissal of its complaint for lack of subject matter jurisdiction. We vacate the trial court's dismissal based on lack of subject matter jurisdiction because the decision regarding allocation of the riverboat subsidy to Indiana's horse racing tracks constitutes an order that is subject to judicial review. Because this Court has jurisdiction to review agency actions, we exercise our authority to review the agency determination and affirm its allocation of the riverboat gaming subsidy between Indiana's two horse racetracks. Consequently, we remand *164 for entry of judgment consistent with this opinion.

Facts and Procedural History
Indiana is home to two horse racing tracks that offer pari-mutuel wagering: Indiana Downs in Shelbyville and Hoosier Park in Anderson. Hoosier Park has been offering live horse racing since September 1, 1994, but Indiana Downs did not hold its first race until December 6, 2002. The administrative agency charged with regulating horse racing in Indiana is the Indiana Horse Racing Commission ("IHRC"). This appeal arises out of a dispute over the distribution of riverboat gaming subsidy funds to the two horse tracks by the IHRC.
As background, we start with a brief review of the subsidization of the horse racing industry in Indiana by the riverboat gaming industry. In 1993, the Indiana General Assembly authorized riverboat gaming in Indiana. As a means of subsidizing the horse racing industry, the legislature enacted Indiana Code § 4-33-12-6(b)(6), which currently provides:
Sixty-five cents ($0.65) of the admissions tax collected by the licensed owner for each person embarking on a gaming excursion during the quarter or admitted to a riverboat during the quarter that has implemented flexible scheduling under IC X-XX-X-XX shall be paid to the Indiana horse racing commission to be distributed as follows, in amounts determined by the Indiana horse racing commission, for the promotion and operation of horse racing in Indiana:
(A) To one (1) or more breed development funds established by the Indiana horse racing commission under IC X-XX-XX-XX.
(B) To a racetrack that was approved by the Indiana horse racing commission under IC 4-31. The commission may make a grant under this clause only for purses, promotions, and routine operations of the racetrack. No grants shall be made for long term capital investment or construction and no grants shall be made before the racetrack becomes operational and is offering a racing schedule.
The General Assembly granted the IHRC the authority to promulgate emergency rules, including rules governing the distribution of riverboat gaming subsidy funds received from the State Treasurer. See Ind.Code § 4-31-3-9 (delineating the powers of the IHRC). The IHRC exercised its rulemaking power by promulgating Indiana Administrative Code title 71, rule 12-2-15[1] ("Section 15"). Section 15 specified *165 how the riverboat gaming admissions tax revenue subsidy would be allocated by the IHRC. At issue in this case are the Distribution Rules for calendar years 2002 and 2003. The 2002 Distribution Rule provided that the subsidy would be allocated to operational racetracks proportionately based on the purses[2] generated by a racetrack and its satellite facilities from handle.[3] 71 IAC 12-2-15(b)(4). For the greater part of calendar year 2002, there was only one operational racetrack in Indiana, Hoosier Park; Indiana Downs did not commence operations until December 2002. In September 2002, the IHRC devised the 2003 Distribution Rule, which allocated the subsidy equally between operational racetracks that raced a minimum of twenty days each of both thoroughbred and standardbred horses. Id. The effective date for the 2003 Distribution Rule was January 1, 2003.
During the 2002 Special Session of the Indiana General Assembly, the legislature eliminated the requirement that Indiana's riverboats cruise every two hours and authorized flexible boarding. Previously, an individual staying on a riverboat for several hours would be considered to be on two or more cruises. Thus, the riverboats would be obligated to pay admission tax multiple times for the same patron. The removal of the cruising requirement had the potential to decrease the amount of admissions taxes collected by the State, which would in turn decrease the subsidy paid to the horse racing industry. To mitigate the potential decrease in the *166 amount available to provide subsidies, the legislature amended Indiana Code § 4-33-12-6(h), which governs the disposition of admissions tax revenue, and Indiana Code § 4-33-13-5(g), which governs the disposition of wagering tax revenue, to establish a minimum amount to be received by the horse racing industry calculated based on the subsidy received in 2002. If the revenue generated from the horse racing industry's share of the admissions tax revenue fell short of this base amount, which was set at $27,205,284.09, then a supplemental lump-sum payment would be made by the State Treasurer to the IHRC to cover the difference in the September following the close of the State's previous fiscal year[4] ("Supplemental Payment"). The funding for the Supplemental Payment would come from riverboat wagering taxes, which otherwise would have been dedicated to the Property Tax Replacement Fund. See Ind.Code § 4-33-13-5(g).
As anticipated, following the implementation of flexible boarding on the riverboats, admissions tax revenue decreased. In fact, the shortfall for fiscal year 2002 was calculated to be $6,727,593.73. Consequently, a lump-sum Supplemental Payment would be paid in September 2003 for riverboat taxes collected by the State during the State's fiscal year 2003, which spanned calendar years 2002 and 2003. Because the taxes were collected in two different calendar years subject to two different distribution formulas, an issue arose regarding how to allocate the 2003 Supplemental Payment between Indiana's operational horse racetracks, Hoosier Park and Indiana Downs.
Hoosier Park and Indiana Downs each filed with the IHRC a position statement on how the Supplemental Payment should be allocated. Hoosier Park recommended that the riverboat taxes collected during calendar year 2002 should be allocated based on the 2002 Distribution Formulai.e., split proportionately based on purses generated from handleand that the riverboat taxes collected during calendar year 2003 should be allocated based on the 2003 Distribution Formulai.e., split equally. Stated otherwise, Hoosier Park sought to have the funds allocated according to when the taxes were collected or the funds "accrued" ("accrual basis"). To the contrary, Indiana Downs sought to have the funds allocated according to when the racetracks received the subsidy, meaning that the 2003 Distribution Formula should be exclusively applied because all of the monies would be received in September 2003 ("cash basis"). The IHRC staff provided the following recommendation:
The formula recommended by staff is based on precedent set by the Commission at a public meeting on November 18, 2002. On that date, after reviewing filings from industry groups and receiving public testimony, the Commission made decisions on the allocation of riverboat revenue to associations and purses. In essence, the Commission was utilizing an "accrual basis" methodology for calculating the disbursement of funds. Staff recommends that the Commission address these issues in an identical manner. In other words, the Commission allocates riverboat monies earned in 2002 as determined on November 18, 2002 and monies earned in 2003 based on the rules applicable in 2003.
This issue can be viewed with greater clarity when seen from the following perspectives. If there had not been a decrease in riverboat admission receipts due to flexible boarding or if the shortfall was paid on a quarterly basis or if the flexible boarding had not become *167 law; then the monies in question would have already ... been allocated based on the Commission's prior decisions and the staff recommendation herein. The only reason this issue has arisen is due to a lump sum payment which spans two calendar years. Thus the Commission should address this issue by reaffirming their [sic] decision from the November 18, 2002[,] meeting.
("Staff Recommendation") Comm'n Supp. App. p. 52. By a vote of 3-2, the IHRC adopted the Staff Recommendation on September 26, 2003.
Indiana Downs filed a Verified Petition for Review pursuant to the Administrative Orders and Procedures Act ("AOPA"), Indiana Code § 4-21.5 et seq. Indiana Downs alleged that the IHRC's decision relating to the allocation of the Supplemental Payment was an "agency action" pursuant to Indiana Code § 4-21.5-1-4 and that it had standing to petition for judicial review as an entity "aggrieved or adversely affected." Ind.Code § 4-21.5-5-3(a)(4). Indiana Downs did not seek judicial review pursuant to the Administrative Rules and Procedures Act ("ARPA"), Indiana Code § 4-22 et seq., in its petition. The IHRC and Hoosier Park responded by moving for dismissal based on a lack of subject matter jurisdiction. In its reply to the IHRC's and Hoosier Park's motions to dismiss, Indiana Downs asserted for the first time that the IHRC's failure to engage in formal rulemaking rendered its decision invalid and subject to judicial review pursuant to the ARPA. See Ind.Code § 4-22-2-45. The trial court granted the motions to dismiss for lack of subject matter jurisdiction, concluding that the IHRC's decision did not constitute "agency action" that was subject to judicial review and that the IHRC was not required to comply with formal rulemaking procedures as its decision was consistent with its own past and accepted practices. Indiana Downs then filed a motion to correct errors, which the trial court denied. This appeal ensued.

Discussion and Decision
Indiana Downs challenges the trial court's determination that the trial court did not have subject matter jurisdiction over its petition for judicial review. Additionally, Indiana Downs maintains that it had standing to obtain judicial review of IHRC's agency action. Finally, Indiana Downs argues that we should vacate the IHRC's decision to utilize both the 2002 Distribution Formula and the 2003 Distribution Formula and order the IHRC to distribute the funds solely according to the 2003 Distribution Formula. We reach each issue in turn.

I. Subject Matter Jurisdiction
The threshold issue in this case is whether the trial court had subject matter jurisdiction over Indiana Downs' petition for judicial review. Indiana Downs argues that the trial court had subject matter jurisdiction because the IHRC's allocation of the Supplemental Payment according to both the 2002 Distribution Formula and the 2003 Distribution Formula constituted a reviewable order or, in the alternative, constituted a rule that was not properly promulgated. The IHRC and Hoosier Park argue that the trial court did not have subject matter jurisdiction because the IHRC's decision was simply a continuation of accepted past practice or precedent and was neither an order nor a rule subject to formal rulemaking procedures.
The standard of appellate review for a motion to dismiss for lack of subject matter jurisdiction is a function of what occurred in the trial court. GKN Co. v. Magness, 744 N.E.2d 397, 401 (Ind.2001). In other words, the applicable standard of review is dependent upon "(i) whether the trial court resolved disputed facts; and (ii) *168 if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a `paper record.'" Id. If the facts before the trial court are not in dispute, then the question of subject matter jurisdiction is purely one of law and our review is de novo. Id. If the facts before the trial court are in dispute and the trial court conducts an evidentiary hearing, "the court typically engages in its classic fact-finding function, often evaluating the character and credibility of witnesses." Id. In such a situation, we give the trial court's factual findings and judgment deference, and we will reverse only if they are clearly erroneous. Id. If the facts are disputed but the trial court rules entirely based upon a paper record, the standard of review on a motion to dismiss for lack of subject matter jurisdiction is again de novo. Id. Here, the trial court ruled on a paper record, so our standard of review is de novo.
Typically when a party challenges a trial court's subject matter jurisdiction over an agency's action, the basis of the challenge is a failure to exhaust administrative remedies. No such challenge is made here. Rather, the IHRC and Hoosier Park claim that there was no order or rule issued by the IHRC subject to judicial review or formal rule promulgating procedures.
To decide whether there is subject matter jurisdiction, we must determine whether the IHRC's 3-2 vote adopting the Staff Recommendation to distribute the Supplemental Payment on an accrual basis constitutes an agency action subject to judicial review. Agency action is defined by the AOPA as the whole or a part of an order; the failure to issue an order; or an agency's performance of, or failure to perform, any other duty, function, or activity under this article. Ind.Code § 4-21.5-1-4. An order, in turn, is defined as an agency action of particular applicability that determines the legal rights, duties, privileges, immunities, or other legal interests of one or more specific persons. Ind.Code § 4-21.5-1-9. By contrast, a rule is defined as the whole or any part of an agency statement of general applicability that has or is designed to have the effect of law and implements, interprets, or prescribes law or policy or the organization, procedure, or practice requirements of an agency. Ind.Code § 4-21.5-1-14. Case law has attempted to further draw a distinction between an administrative order and an administrative rule by recognizing that an order operates retrospectively upon events that have already occurred, whereas a rule has a prospective effect. Smith v. State Lottery Comm'n of Ind., 701 N.E.2d 926, 930 (Ind.Ct.App.1998), clarified on reh'g, trans. denied; see also Miller Brewing Co. v. Bartholemew County Beverage Co., 674 N.E.2d 193, 202 (Ind.Ct.App.1996) ("It is axiomatic that the administrative rulemaking function, which results in administrative rules, is distinguished from the adjudicatory function of an agency, which results in administrative orders. The former involves an element of generality and operates prospectively upon a class of individuals while the latter operates retrospectively upon a particular individual or circumstance."), trans. denied.
There is no dispute that both Indiana Downs and Hoosier Park are entitled to a share of the Supplemental Payment. See 71 IAC 12-2-15. In other words, no one claims that Indiana Downs did not have a legal right or interest to at least some of the funds; rather, the dispute revolves around which distribution formula found in 71 IAC 12-2-15(b)(4) applies. The IHRC's adoption of the Staff Recommendation, which required the funds to be distributed on an accrual basis, therefore determined the legal rights and interests of Indiana Downs. In this regard, the decision of the IHRC is properly classified *169 as an order. Furthermore, the IHRC's decision had a retrospective application in that it determined what proportion of the Supplemental Payment Indiana Downs and Hoosier Park were each entitled to after the State Treasurer determined that the Supplemental Payment was necessary for fiscal year 2002. See I.C. § 4-33-13-5(g).[5] According to Indiana Code § 4-33-13-5(g), the State Treasurer was to determine if entities were entitled to a supplemental payment before September 15, 2003. The IHRC did not make its decision regarding how the Supplemental Payment would be split until September 26, 2003 after the State Treasurer was to have determined if the Supplemental Payment would be required in 2003. Thus, the IHRC's decision had a retrospective application in that it provided a means of precisely calculating Indiana Downs' legal right to and interest in funds after the State Treasurer determined a supplemental distribution would be made.
Moreover, we find this Court's decision in Smith to be instructive. In Smith, we tackled the question of whether Smith sought review of an administrative order or a rule. 701 N.E.2d at 930-31. Smith argued that he was disputing a Lottery rule of general application that states that the Lottery will not pay prizes for winning instant tickets submitted more than sixty days after the end of a game, and therefore, he was not required to exhaust his administrative remedies. Nonetheless, we found that the Lottery's denial of Smith's request to redeem his ticket operated "retrospectively upon events which had already occurred" and determined "the legal rights ... of one or more specific persons." Id. at 930. Thus, we concluded, "Smith wanted his prize and went to the Lottery office to demand it. In contesting the application of the Lottery's rule to his individual case, Smith is actually contesting an order." Id. at 931.
Likewise, in this case, Indiana Downs is contesting an order because the IHRC's action not only has retrospective application, but also it is directed specifically at Indiana Downs and Hoosier Parks as the only two entities that qualified as associations eligible for funds. Based on the foregoing, we conclude that the IHRC's September 26, 2003, decision regarding how to split the funds constitutes an order subject to judicial review.[6]

II. Standing
Having concluded that the IHRC's adoption of the Staff Recommendation constitutes an order subject to judicial review, we now must determine whether Indiana Downs has standing to obtain judicial review because standing is a statutory prerequisite to the pursuit of a petition *170 for judicial review. See Ind. Dep't of Envtl. Mgmt. v. Jennings Northwest Reg'l Utils., 760 N.E.2d 184, 188 (Ind.Ct.App.2001) (citing Ind.Code §§ 4-21.5-5-2, 4-21.5-5-3, and 4-21.5-5-7). An entity has standing to obtain judicial review of an agency action if (1) it is the entity to which the agency action is specifically directed; (2) it was a party to the agency proceedings that led to the agency action; (3) it is eligible for standing under a law applicable to the agency action; or (4) it is otherwise aggrieved or adversely affected by the agency action.[7]Id. (citing Ind.Code § 4-21.5-5-3(a)); cf. Huffman v. Office of Envtl. Adjudication, 811 N.E.2d 806, 810 (Ind.2004) (discussing the interplay between the judicial doctrine of standing and the qualification requirements for administrative review of an agency order).
Our review of this matter convinces us that Indiana Downs has standing under two of the statutorily prescribed categories of standing for judicial review. The IHRC invited both Indiana Downs and Hoosier Park to submit position statements regarding how the 2003 Supplemental Payment should be allocated between the two horse racetracks. In response, both racetracks submitted proposals. By virtue of the invitation to comment and acceptance of that invitation by submission of a position statement, we find that Indiana Downs was a party to the agency proceedings that led to the agency action. Additionally, we find a second basis for standing; namely, the fact that Indiana Downs was an entity to which the agency action was specifically directed establishes its standing. We reach this conclusion becausealthough not mentioned by nameIndiana Downs and Hoosier Park were the only two horse racetracks entitled to receive funds and were even invited by the IHRC to submit position statements. Thus, Indiana Downs has standing to seek judicial review.

III. Judicial Review of the Administrative Determination
Turning now to the merits of the IHRC's order, we note that Indiana Code § 4-21.5-5-14 prescribes the scope of court review of an administrative decision. That section states that a court may provide relief only if the agency action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Huffman, 811 N.E.2d at 809; see also Dep't of Natural Res. v. Ind. Coal Council, Inc., 542 N.E.2d 1000, 1007 (Ind.1989) ("[A]n administrative act is arbitrary and capricious only where it is willful and unreasonable, without consideration and in disregard of the facts and circumstances in the case, or without some basis which would lead a reasonable and honest person to the same conclusion."). Section 4-21.5-5-14(a) *171 further provides that "[t]he burden of demonstrating the invalidity of the agency action is on the party ... asserting invalidity." In reviewing an administrative decision, a court is not to try the facts de novo or substitute its own judgment for that of the agency. Ind.Code § 4-21.5-5-11.
Once it was determined that there would be a 2003 Supplemental Payment, questions arose regarding how the funds would be divided between Indiana Downs and Hoosier Park. The questions stemmed from the fact that the supplemental funds were calculated on a fiscal year basis, but the distribution formulas were based on calendar years. To complicate matters further, Indiana Downs had been in operation for less than one month in calendar year 2002. Nonetheless, Indiana Downs argued for an equal distribution of the 2003 Supplemental Payment or that only the 2003 Distribution Formula should be applied. Hoosier Park advocated that both the 2002 Distribution Formula and the 2003 Distribution Formula should be applied because the State collected a portion of the funds from the riverboats in each of those years. The IHRC Staff recommended that consistent with precedent an accrual basis methodology should be used to distribute the funds, basing distribution on when the tax was collected. This meant that wagering taxes collected in 2002 should be distributed according to the 2002 Distribution Formula and wagering taxes collected in 2003 should be distributed according to the 2003 Distribution Formula. The IHRC voted to adopt the Staff Recommendation.
We cannot say the IHRC's decision was arbitrary and capricious for three reasons. First and foremost, the decision was based on the application of a pre-existing rule. See 71 IAC 12-2-15. Second, the decision was consistent with prior practice. See Comm'n Supp. App. p. 52 ("The formula recommended by staff is based on precedent."). Third, and finally, to allow Indiana Downs to share equally in proceeds from calendar year 2002 could properly be viewed by the IHRC as unjust because Indiana Downs was only in operation for less than one month of that year. Indiana Downs has failed to establish that the IHRC's act was unreasonable, without consideration and in disregard of the facts in circumstances of the case, or without some basis that would lead a reasonable and honest person to the same conclusion. For these reasons, we remand this case to the trial court so that it may enter an order affirming the IHRC's decision to divide the 2003 Supplemental Payment using both the 2002 Distribution Formula and the 2003 Distribution Formula.
Vacated and remanded.
SHARPNACK, J., and MAY, J., concur.
NOTES
[1] The full text of 71 IAC 12-2-15, at times relevant to this appeal, provided:

(a) An association must be racing live in order to be eligible to receive distributions of riverboat gaming admissions tax revenue pursuant to this section.
(b) The commission shall allocate the riverboat gaming admissions tax revenue distributed to the commission by the treasurer of state pursuant to IC X-XX-XX-X as follows:
(1) Twenty percent (20%) divided between the standardbred breed development fund, thoroughbred breed development fund, and quarter horse breed development fund as established by the commission under IC X-XX-XX-XX as follows:
(A) Forty-eight (48%) to standardbred breed development.
(B) Forty-eight (48%) to thoroughbred breed development; and
(C) Four (4%) to quarter horse breed development.
(2) Forty percent (40%) to purses for the benefit of horsemen, which shall be divided forty-nine percent (49%) to standardbred purses, forty-nine percent (49%) to thoroughbred purses, and two percent (2%) to quarter horse purses. If more than one (1) track races a [sic] standardbreds or thoroughbreds, purses for that breed shall be divided to the purse accounts of the tracks in question proportionally based upon the number of live race dates for that breed. If more than one (1) track races quarter horses, purses for that breed shall be divided to the purse accounts of the tracks in question proportionally based upon the number of live races for that breed. To the extent practical, the revenue received under this subsection shall be distributed as purses for the benefit of horsemen in the year in which the revenue is received.
(3) In a year in which only one (1) association conducts live pari-mutuel racing, forty percent (40%) shall go to the association after the first five hundred thousand ($500,000) is distributed as follows:
(A) Two hundred thousand ($200,000) to the thoroughbred development fund.
(B) Two hundred thousand ($200,000) to the standardbred development fund.
(C) One hundred thousand ($100,000) to the quarter horse development fund.
Such revenue may be used by the association for purses, promotions, and routine operations of the race track. Provided, however, that such monies shall not be used for long term capital investment or construction.
(4) In a year in which more than one (1) association conducts live pari-mutuel racing, forty percent (40%) to the associations, which shall be divided proportionately based on the total purses, irrespective of any breed considerations, generated by each association's track and satellite facilities from the following sources:
(A) Live handle at track.
(B) Live handle at satellite facilities.
(C) Interstate simulcasting receiving handle.
(D) Interstate simulcasting sending handle.
Notwithstanding the above formula, in calendar year 2003, the forty percent (40%) shall be divided equally between associations if each association races a minimum of twenty (20) days each of both thoroughbred and standardbred. In calendar year 2004, one-half (1/2) of the forty percent shall be divided equally between associations if each association races an extended race meet of both thoroughbred and standardbred. The other half of the forty percent (40%) shall be divided proportionately based on total purses as described above.
(c) Subdivision [Subsection] (b)(4) expires on December 31, 2004.
[2] A "purse" is the total cash amount available for the participants in any particular horse race. See Ind. Admin. Code tit. 71, r. 1-1-89.
[3] "`Handle' means the aggregate of all pari-mutuel pools, excluding refundable wagers." Ind. Admin. Code tit. 71, r. 1.5-1-44.
[4] The State's fiscal year runs from July 1 to June 30. Ind.Code § 4-1-1-1.
[5] In pertinent part, Indiana Code § 4-33-13-5 provides:

Before September 15 of 2003 and each year thereafter, the treasurer of state shall determine the total amount of money distributed to an entity under IC X-XX-XX-X during the preceding state fiscal year. If the treasurer of state determines that the total amount of money distributed to an entity under IC X-XX-XX-X during the preceding state fiscal year was less than the entity's base year revenue (as determined under IC X-XX-XX-X), the treasurer of state shall make a supplemental distribution to the entity from taxes collected under this chapter and deposited into the property tax replacement fund. The amount of the supplemental distribution is equal to the difference between the entity's base year revenue (as determined under IC X-XX-XX-X) and the total amount of money distributed to the entity during the preceding state fiscal year under IC X-XX-XX-X.
[6] Because we decide the IHRC's decision is an order, we need not discuss the other alleged grounds for reversing the trial court's determination that Indiana Downs was not entitled to judicial review based on lack of subject matter jurisdiction.
[7] An entity has standing under the fourth requirement, however, only if (1) the agency action has prejudiced or is likely to prejudice the interests of the entity; (2) the entity was eligible for an initial notice of an order or proceeding under Indiana Code § 4-21.5, was not notified of the order or proceeding in substantial compliance therewith, and did not have actual notice of the order or proceeding before the last date in the proceeding that the entity could object or other-wise intervene to contest the agency action; (3) the entity's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; and (4) a judgment in favor of the entity would substantially eliminate or redress the prejudice to the entity caused or likely to be caused by the agency action. I.C. § 4-21.5-5-3(b). Cf. Ind.Code § 4-21.5-3-7(a)(1) (setting forth standing requirements for adjudicative proceedings).