**FOR PUBLICATION**



ATTORNEYS FOR APPELLANT:

**KARL L. MULVANEY**
**NANA QUAY-SMITH**
**ROBIN L. BABBIT**
Bingham Greenbaum Doll LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL N. RED**
Morse & Bickel, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| INDIANA HORSE RACING COMMISSION, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1206-PL-512 |
| | ) | |
| EDMUND W. MARTIN, JR., | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable S.K. Reid, Judge
Cause No. 49D14-1109-PL-37951

**June 28, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

The issue presented in this appeal is whether Edmund Martin ("Martin") participated in pari-mutuel horse racing and was therefore required to be licensed pursuant to Indiana Code section 4-31-6-1 and 71 Indiana Administrative Code rule 5.5-1-1. The Indiana Horse Racing Commission ("the IHRC") appeals the Marion Superior Court's decision to vacate its order excluding Martin from its racetracks because he failed to obtain a license in 2010.

Concluding that Martin did indeed participate in horse racing, we reverse the trial court's order setting aside the IHRC's decision and remand for proceedings consistent with this opinion.

**Facts and Procedural History**

Martin was the executive director and a paid employee of the Indiana Thoroughbred Owners and Breeders Association ("the ITOBA") in 2010. The ITOBA represents the interests of Indiana thoroughbred owners, breeders, and trainers with the purpose of promoting, developing, and improving thoroughbred horse racing in Indiana. In support of that goal, the ITOBA's activities include lobbying the General Assembly on behalf of the horse racing industry, marketing in support of the industry, and the organization of annual horse sales at Indiana's racetracks. The sales include live horse auctions, paddock sales, yearling and unraced prospect sales, and sales of racing stock.

The ITOBA receives most of its income from the commissions generated by the horse sales; but it may also apply for and receive funds from the IHRC. Specifically, in 2010, the IHRC approved the ITOBA as a registered horseman's association allowing the ITOBA to provide pari-mutuel related services. The funds the ITOBA received from the

2

IHRC were generated at Indiana's racetracks. Martin's ITOBA salary was paid at least in part by the gaming funds. Appellant's App. p. 427.

In his capacity as the ITOBA's executive director and as an employee, Martin 1) attended all ITOBA meetings, 2) lobbied the General Assembly on the organization's behalf, 3) executed all decisions of the board, and 4) planned, organized and directed the ITOBA's programs and services. Also, the ITOBA's bylaws required members of the board of directors to "attend all board meetings, [and] regularly participate in organization meetings, committees, and functions . . ." Id. at 854.

The IHRC was created for the purpose for ensuring that "pari-mutuel wagering on horse races in Indiana will be conducted with the highest standards and greatest level of integrity." Ind. Code § 4-31-1-2. Consistent with that purpose, the IHRC requires certain individuals participating in horse racing to be licensed.

In April 2010, Martin received an email from Deena Pitman, an IHRC staff member, reminding him that he had not yet sought a license for that calendar year, and he was urged to do so prior to the start of the 2010 racing season, if he intended to participate in horse racing activities. Martin advised Deena Pitman that he would not have access to gaming funds and would not be handling ITOBA business at the racetrack. Therefore, Martin did not apply for a license.

Subsequently, Martin had meetings at Hoosier Park racetrack to discuss ITOBA business, and he was present at the 2010 ITOBA horse sales at Hoosier Park. The ITOBA meeting minutes also disclose that Martin agreed to "cover" the ITOBA's booth space at the Hoosier Horse Fair.

3

On November 4, 2010, the IHRC sent an exclusion notice to Martin due to his failure to seek a license in 2010. Martin was informed that he would be excluded from the IHRC's grounds until he secured a valid 2010 license. After Martin objected to the exclusion notice, the IHRC appointed an administrative law judge ("the ALJ") to review the matter. Both Martin and the IHRC filed motions for summary judgment concerning Martin's obligation to obtain a license.

On August 11, 2011, the ALJ issued her recommended order, which was unanimously adopted as the IHRC's final order on August 23, 2011. In the order, the ALJ concluded that Martin engaged in activities in 2010 "that required him to seek and obtain a license from the" IHRC. Appellant's App. p. 20. The ALJ also found in pertinent part:

21. In the calendar year 2010, the ITOBA was a registered horsemen's association approved by the [IHRC] pursuant to the provisions of 71 IAC 13-1-1 et seq. to provide pari-mutuel related services on behalf of Indiana thoroughbred owners and breeders.

22. In the calendar year 2010, Mr. Martin was employed as ITOBA's Executive Director and had job duties which required his presence from time to time on association grounds. Mr. Martin earned a salary of $41,000 as ITOBA's Executive Director.

23. Mr. Martin's job duties as Executive Director included, in addition to working the ITOBA sale, the following:
    1. Represents the ITOBA at all levels of the industry.
    a) State General Assembly; b) Indiana Horse Racing Commission; c) Thoroughbred Breed Development advisory committee; d) *All Indiana Race Tracks*; e) Industry collective efforts; and f) Hoosier Horse Fair
    2. Ensures that the board of directors and the officers are kept fully informed on the conditions and operations of ITOBA and all industry issues that influence them. *Attends all meetings of the board*, Executive Committee and advisory committees.

4

3. Executes all decisions of the board and Executive Committee except when other assignment is specifically made by the board or Executive Committee.

4. *Plans, organizes and directs programs and services*: Evaluates policies procedure and actions to achieve program goals.

5. Serves as liaison between all advisory committees and Board and executive committees.

6. Maintains effective relationships with all other breed groups.

7. Advises and backs up the Executive Secretary to help complete administrative tasks on time.

8. Carries out such other general responsibilities as may be delegated by the executive committee and the board.

24. During February and March of 2010, Mr. Martin engaged in activities requiring a license from the [IHRC], but did not seek to obtain a license.

25. For instance, at the February 2010 meeting of the ITOBA Board of Directors held at Indiana Downs, Mr. Martin engaged in the following activities:
- o Introducing Jackie Brown as the new ITOBA Executive Secretary
- o Discussing with ITOBA Directors pending legislation in the Indiana State Senate -specifically, SB01-during the Regulatory and Legislation Committee Report.
- o Participating in a motion by the ITOBA Directors to form a committee (the "Committee"), along with the Indiana Horsemen's Benevolent and Protective Association ("IHBPA"), to come up with a long-term total thoroughbred industry proposal.
- o Stating that he would confer with Mike Brown regarding IHBPA's involvement with the Committee; and
- o In the course of the Hoosier Horse Fair and Expo Committee Report, agreeing to cover the booth space for the Hoosier Horse Fair.

26. Furthermore, at the March 2010 meeting conducted at Indiana Downs, Mr. Martin engaged in the following activities:
- o Presenting ITOBA's financial report
- o Requesting Board approval to purchase a retractable sign for use at the Hoosier Horse Fair and at other ITOBA functions;
- o Reporting, during the course of the Membership Gatherings Committee Report, on a membership drive letter that was mailed in early February 2010;

o Reporting, in the course of the Regulatory Committee Report, on the most recent Commission meeting and

o Making a motion, during the course of the Sales Committee Report, to have a sale on Sunday, July 25, 2010

27. On April 8, 2010, and in anticipation of the commencement of the racing season on April 16, 2010, Deena Pitman sent an email ("the Pitman email") to all known 2010 registered horsemen employees, including Mr. Martin, reminding them to seek licensure prior to the start of the 2010 racing season if they would be engaging in activities in 2010 which would require licenses.

28. The Pitman email referred its recipients to the relevant regulations and generally described the actions that would require licensure.

29. Mr. Martin responded on April 8, 2010 and advised Ms. Pitman that . . . he . . . would [not] "have access to any slot funds or will be handling any association business at the track or need access to the backside." Neither in his response nor anytime thereafter did Mr. Martin challenge Ms. Pitman's interpretation of the rule requiring licensure or seek further clarification.

30. Subsequent to his response to Ms. Pitman, in which he represented that he would not be engaging in activities requiring licensure, Mr. Martin conducted ITOBA business at Hoosier Park in Brian Elmore's office and worked the July and October 2010 ITOBA sales at Hoosier Park.

31. The activities which Mr. Martin engaged in constitute participation in "horse racing" and "pari-mutuel racing" within the meaning of the aforementioned statutes and regulations.

Appellant's App. pp. 20-23 (emphasis added and footnote and record citations omitted).

Ultimately, the ALJ concluded that the exclusion notice was supported by substantial evidence, was consistent with Indiana law and the public interest, and protected the IHRC's interest to ensure the honesty and integrity of racing. The IHRC approved the ALJ's order extending Martin's exclusion from IHRC grounds until July 18, 2012.

On September 29, 2011, Martin filed a petition for review of the IHRC's order in Marion Superior Court. After reviewing the parties' motions for summary judgment and

holding a hearing on the matter, the trial court set aside the IHRC's order and vacated the exclusion notice.

The trial court concluded that the IHRC's finding that Martin conducted ITOBA business at Hoosier Park and worked the July and October 2010 ITOBA horse sales was not supported by substantial evidence. However, the trial court concluded that the IHRC's error was harmless because it did not affect the court's ultimate conclusion that Martin was not required to be licensed in 2010. Id. at 7. Specifically, the court determined that the activities Martin engaged in as the Executive Director of the ITOBA do not constitute participation in racing, participation in pari-mutuel racing, or provide pari-mutuel related services as those terms are defined in the Indiana Administrative Code.

The IHRC now appeals the trial court's order setting aside, dissolving, and vacating its August 23, 2011 order.[1]

### Standard of Review

The Administrative Orders and Procedures Act provides the standard for judicial review of an administrative decision. When we review the decision of an administrative agency, we are bound by the same standard of review as the trial court. Kroger Co. v. Plan Comm'n of Town of Plainfield, 953 N.E.2d 536, 539 (Ind. Ct. App. 2011), trans. denied. The administrative agency's decision will be affirmed unless it is:

---

[1] We held oral argument in this appeal on May 8, 2013 before the Sagamore American and Indianapolis American Inns of Court at the Indiana University Robert H. McKinney School of Law in Indianapolis, Indiana. We express our gratitude for their generous hospitality.

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d); see also Indianapolis Downs, LLC v. Ind. Horse Racing Comm'n, 827 N.E.2d 162, 170 (Ind. Ct. App. 2005). An administrative decision is arbitrary and capricious only when it is willful and unreasonable, without consideration or in disregard of the facts and circumstances of the case, or without some basis which could lead a reasonable person to the same conclusion. Indianapolis Downs, 827 N.E.2d at 170.

The party challenging an agency decision bears the burden of demonstrating its invalidity. I.C. § 4-21.5-5-14(a). When reviewing an administrative agency's decision, "[n]either the trial court nor this court may reweigh the evidence or reassess witness credibility." Andrianova v. Ind. Family Soc. Servs. Admin., 799 N.E.2d 5, 7 (Ind. Ct. App. 2003). Rather, we must accept the facts as found by the agency factfinder. Id. In addition, in light of an administrative agency's expertise in its given area, we give deference to the agency's interpretation of the statutes and rules it is charged with enforcing. Id.

**Discussion and Decision**

Initially, we note the substantial deference our court affords to administrative agencies like the IHRC in their interpretation of the statutes and regulations they are required to enforce.

An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. . . . Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency. If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. However, an agency's incorrect interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

Dev. Servs. Alts., Inc. v. Ind. Family & Social Servs. Admin., 915 N.E.2d 169, 181 (Ind. Ct. App. 2009), trans. denied (quoting Pierce v. State Dep't of Correction, 885 N.E.2d 77, 89 (Ind. Ct. App. 2008)) (citations and quotation marks omitted). See also Chrysler Group, LLC v. Review Bd. of Ind. Dep't of Workforce Dev., 960 N.E.2d 118, 124 (Ind. 2012) (acknowledging the deference afforded to an agency's interpretation of the statutes it is charged with enforcing and stating "we defer to the agency's reasonable interpretation of such a statute even over an equally reasonable interpretation by another party").

The General Assembly's stated purpose in enacting the Pari-Mutuel Wagering Act is "to permit pari-mutuel wagering on horse races in Indiana and to ensure that pari-mutuel wagering on horse races in Indiana will be conducted with the highest of standards and the greatest level of integrity." I.C. § 4-31-1-2. Consistent with that goal, the IHRC is charged with adopting regulations that the IHRC "determines is in the public

9

interest in the conduct of recognized meetings and wagering on horse racing in Indiana." See I.C. § 4-31-3-9. The IHRC is further authorized to adopt rules establishing a procedure for license applications and fees. See I.C. § 4-31-6-2.

A "'[p]erson required to have a license' means an individual whose activities on a racetrack would require the person to be licensed." I.C. § 4-31-2-16. And "[a] person must be a licensee in order to . . . participate in racing at a racetrack or a satellite facility that permits the pari-mutuel form of wagering[.]" I.C. § 4-31-6-1. The IHRC may "refuse or deny a license application, revoke or suspend a license, or otherwise penalize a licensee" for multiple reasons including that "the refusal, denial, revocation, suspension, or other penalty is in the public interest for the purpose of maintaining proper control over horse racing meetings or pari-mutuel wagering[.]" I.C. § 4-31-6-6(a).

The Pari-Mutuel Wagering Act does not define the phrase "participate in racing" but simply requires those who participate in racing to have a license. I.C. § 4-31-6-1. The ordinary and plain meaning of the term "participate" is "to take part" or "to have a part or share in something." See http://merriam-webster.com/dictionary/participate. Similarly, the Oxford English Dictionary assigns the following meaning to the term participate: "To take or have a part or share of or in; to share in; to possess or enjoy in common with another or others[.]" Finally, the term "race" is defined in the Act and means a "contest of speed among horses: (1) for a purse, stakes, premiums, wager of money, or for admission fees: (2) on a course; and (3) in the presence of a judge or judges." I.C. § 4-31-2-18.

The IHRC admits that its interpretation of the phrase "participate in racing" is broad, but contends that interpretation is consistent with its statutory requirement to conduct "pari-mutuel horse racing under 'the highest of standards and greatest level of integrity.'" Appellant's Br. at 17. The agency argues that "[r]equiring licensure of persons who participate in racing is one of the [IHRC's] most effective weapons in its battle to ensure the integrity of pari-mutuel racing."[2] Id. at 26.

Accordingly, the IHRC promulgated Rule 5.5-1-1(a) broadly defining which persons must be licensed to participate in pari-mutuel racing:

> (a) A person shall not participate in pari-mutuel racing under the jurisdiction of the commission without a valid license issued by the commission. License categories shall include the following and others as may be established by the commission:
>> (1) Racing participants and personnel (including owner, authorized agent, trainer, assistant trainer, jockey, apprentice jockey, jockey agent, veterinary helper, farrier, stable employees, exercise rider, groom, pari-mutuel clerk, pony rider, track employee, track security, vendor employee, starting gate crew, farrier's assistant, valet, track management, practicing or racing veterinarian, or other).
>> (2) Racing officials as listed in 71 IAC 3.5.
>> (3) **Persons employed by the association, or employed by a person or concern contracting with or approved by the association or commission to provide a pari-mutuel related service or commodity, with job duties which require their presence in a restricted area or which require their presence anywhere on association grounds.**
>> (4) Sole proprietors and all partners of a partnership contracting with or approved by the association or commission to provide a service or commodity.
>> (5) Shareholders in a corporation, acting as a contractor or vendor, if required by the commission.

---

[2] The IHRC requires licensees to report violations of its rules. See 71 I.A.C. r. 5.5-1-27 ("A licensee shall be knowledgeable of these rules and, by acceptance of the license, agrees to abide by these rules. []A licensee shall report to track security or the stewards any knowledge the licensee has that a violation of these rules has occurred or may occur.").

(6) Commission employees with job duties which require their presence in a restricted area or which require their presence anywhere on association grounds.

71 I.A.C. r. 5.5-1-1 (emphasis added). Association grounds means "all real property utilized by the association in the conduct of its race meeting, including the race track, grandstand, concession stands, offices, barns, stable area, employee housing facilities, parking lots, and any other areas under the jurisdiction of the commission, including satellite facilities." See 71 I.A.C. r. 1.5-1-12.

Furthermore, the IHRC has promulgated rules for horsemen's associations such as the ITOBA. Specifically, title 71, rule 13-1-15 of the Indiana Administrative Code provides:

All directors, officers, and employees of a registered horsemen's association that will have access to any funds received pursuant to IC 4-35-7-12 if not otherwise licensed and in good standing with the commission, must apply for and be granted a separate commission license to act as a director, officer, or employee of a horsemen's association in order to serve in that capacity. If a director, officer, or employee of a registered horsemen's association that will have access to any funds received pursuant to IC 4-35-7-12 is otherwise licensed and in good standing with the commission, then that person is also considered to be licensed as a director, officer, or employee of the horsemen's association.

Indiana Code section 4-35-7-12 mandates the manner in which gambling proceeds from racetracks are distributed. A certain percentage of those funds are distributed to horsemen's associations for specific purposes such as promoting the equine industry and equine welfare. I.C. § 4-35-7-12(c). In 2010, the IHRC approved the ITOBA as a registered horsemen's association to receive funds under section 4-35-7-12. See 71 I.A.C.

12

r. 13-1-2 (describing the findings the IHRC is required to make to approve horsemen's associations to receive funds pursuant to I.C. § 4-35-7-12).

Martin argues the IHRC's interpretation of Indiana Code section 4-31-6-1 through its promulgation of Rule 5.5.-1-1(a) is unreasonable, contrary to law, and that the "General Assembly did not intend to require licensure of all 'racing industry participants,' rather, only those actually 'participating in racing.'"[3] Appellee's Br. at 16. But, Martin's categorization of horse racing as an activity rather than an industry is not well taken in light of the regulation, funds, and related activities that surround pari-mutuel horse races. Moreover, Martin's narrow interpretation of the phrase "participate in racing" is inconsistent with the General Assembly's decision to give the IHRC broad authority to promulgate rules to enforce the Pari-Mutuel Wagering Act.

Protecting the integrity of the horse racing industry in Indiana is of utmost importance to the IHRC and the General Assembly. The industry "has an unsavory, or at least a shadowed, reputation, growing out of a long history of fixing, cheating, doping of horses, illegal gambling, and other corrupt practices." Dimeo v. Griffin, 943 F.2d 679, 681 (7th Cir. 1991). For this reason, the IHRC reasonably takes a broad view of the

---

[3] The IHRC argues that Martin has waived this argument because it was not raised in the proceedings below. Issues that are not raised before the administrative agency are generally waived for judicial review. Mark P'Pool v. Ind. Horse Racing Comm'n, 916 N.E.2d 668, 676 (Ind. Ct. App. 2009) (citing Ind. Code § 4-21.5-5-10). We agree that during the administrative hearings Martin did not specifically argue that Rule 5.5-1-1 was contrary to law or that the Commission's interpretation of that rule was unreasonable. However, Martin did argue that the IHRC's interpretation of the phrase "participate in racing" was overly broad and suggested that only those individuals who directly participate in the act of pari-mutuel racing should be required to be licensed. We therefore address his argument concerning the reasonableness of Rule 5.5-1-1 because the IHRC's interpretation of the phrase "participate in racing" is manifested in that rule.

13

phrase "participate in racing" to include those individuals who are directly or indirectly participating in pari-mutuel racing.

Specifically, the IHRC concludes that the many types of persons who are enumerated as participants in racing as listed in Rule 5.5-1-1(a)

> encompasses a large, diverse group of persons who are involved in the racing industry on a variety of levels . . . . The scope of persons who are "participants in pari-mutuel racing" is not determined by their function at the racetrack, but by their involvement with other racing participants at the racetrack, or their opportunity for access to restricted areas of the racetrack. . . or access to the racehorses themselves.

Appellant's Br. at 19. We agree and conclude that, within the context of its charge by the General Assembly, the IHRC reasonably interpreted Indiana Code section 4-31-6-1, and particularly the phrase "participate in racing," when it promulgated Rule 5.5-1-1(a), which defines which persons must be licensed to participate in pari-mutuel racing.

Accordingly, we now consider whether Martin was required to be licensed pursuant to Rule 5.5-1-1(a). The IHRC argues that Martin's actions and his status with ITOBA met the precise criteria of" Rule 5.5-1-1(a)(3). That subsection requires licensure for "[p]ersons employed by the association, or employed by a person or concern contracting with or approved by the association or commission to provide a pari-mutuel related service or commodity, with job duties which require their presence in a restricted area or which require their presence anywhere on association grounds." 71 I.A.C. r. 5.5-1-1(a)(3).

14

In 2010, the ITOBA was a registered horsemen's association *with approval* to render pari-mutuel related services or commodities.[4] And pursuant to Indiana Code section 4-35-7-12, the IHRC provided funds to the ITOBA that were generated by the state's racetracks.[5] The IHRC determined that Martin was required to be licensed under Rule 5.5-1-1(a)(3) because he was the executive director of the ITOBA, which is a "concern . . . approved by the . . . commission to provide a pari-mutuel related service" and Martin's job duties required his presence "in a restricted area" and/or "on association grounds." Br. of Appellant at 23.

The record strongly supports the IHRC's claim that as executive director of the ITOBA, Martin had direct access to racehorses and their owners. The ITOBA is intimately involved in the sales of horses that are likely to participate in future pari-mutuel racing. The IHRC also contends that the evidence establishes that Martin "worked" the July and October horse sales at Hoosier Park Racetrack. The director of security for the IHRC reported that Martin was loading horses for transport at the October horse sale.[6] Appellant's App. p. 347.

---

[4] Martin argues that the ITOBA never actually rendered "pari-mutuel related services or commodities." However, the promotion and sale of thoroughbred horses that will likely be trained for racing and used in races subject to wagering is providing a pari-mutuel related service or commodity, particularly where the ITOBA benefits financially from its sales of race horses. The rule only requires that the ITOBA was *approved* by the IHRC to provide such services and not that the ITOBA actually rendered pari-mutuel services.

[5] 71 Indiana Administrative Code rule 13-1-5 provides that all "directors, officers, and employees of a registered horsemen's association that will have access to any funds received pursuant to IC 4-35-7-12 if not otherwise licensed and in good standing with the commission, must apply for and be granted a separate commission license to act as a director, officer, or employee of a horsemen's association in order to serve in that capacity." Martin denied any access to such funds, and the IHRC does not dispute Martin's denial.

[6] Without any additional discussion, the trial court found that this finding was not supported by substantial evidence. Our review of the record leads us to come to the opposite conclusion. The IHRC's

The IHRC summarizes the merits in this case well when it argues that the IHRC's decision to require licensure

> is completely reasonable, given that (1) ITOBA receives sales commissions based on the horse's sale price; (2) the horses were being exhibited in timed work outs for the purpose of soliciting buyers; (3) Martin was ITOBA's employee and executive director, (4) ITOBA was approved by the [IHRC] to receive wagering funds and provide pari-mutuel related services; and (5) Martin was intimately involved in the provision of ITOBA's services at the track, and thus was in the position to observe and report any Rule violations by owners, trainers or other racing participants.

Appellant's Br. at 24. Moreover, we observe that the ITOBA directly benefited from pari-mutuel wagering in 2010 because it received gambling proceeds from the IHRC pursuant to Indiana Code section 4-35-7-12.

Our standard of review is well-settled, and Martin has not established that the IHRC's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and its decision was supported by substantial evidence. Martin was required to be licensed pursuant to Indiana Code section 4-31-6-1 and rule 5.5-1-1(a) because he was the ITOBA's executive director in 2010 and an active participant in the ITOBA's activities at Indiana's horse racing tracks. For all of these reasons, we reverse the Marion Superior Court's order setting aside and vacating the IHRC's order excluding Martin from IHRC grounds and remand this case with instructions to reinstate the IHRC's order and exclusion notice.

Reversed and remanded for proceedings consistent with this opinion.

BAKER, J., and BROWN, J., concur.

---

director of security's observations of Martin's activities at Hoosier Park were included in the agency record.

16